WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lexington Insurance Company, a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>Scott Homes Multifamily, Inc., an Arizona corporation; and Silverbell 290 Limited Partnership, an Arizona Limited Partnership,<br><br>Defendants. | No. CV-12-02119-PHX-JAT<br><br>**ORDER** |

Pending before the Court are: (1) Plaintiff's Motion to Dismiss Silverbell 290 Limited Partnership's Counterclaim (Doc. 27) and (2) Scott Homes Multifamily, Inc.'s Motion to Dismiss (Doc. 41). The Court now rules on the Motions.

**I.    Background**

**A.    The Complaint**

On October 8, 2012, Lexington filed its Complaint in this Court. (Doc. 1) In its Complaint, Lexington alleges as follows:

On March 2, 2010, Defendant Silverbell 290 Limited Partnership ("Silverbell")[1]

---

[1] Silverbell is a general partner of Timberline Village Corporation ("Timberline"). (*Id.* at ¶ 7). Timberline is owned by the Steven S. Robson Trust dated June 25, 1993 (the "Robson Trust"). (*Id.* at ¶ 8). Steven S. Robson is the trustee of the Robson Trust. (*Id.*).

1 sued Defendant Scott Homes Multifamily, Inc. ("Scott"), among others, in Pima County
2 Superior Court (the "state court case"). (*Id.* at ¶ 13). Silverbell is the owner of an
3 apartment complex called the Springs at Silverbell Apartments (the "Silverbell
4 Apartments"). (*Id.* at ¶ 6). In its Amended Complaint in the state court case, Silverbell
5 alleged that Scott was the general contractor in the construction of the Silverbell
6 Apartments pursuant to a contract, and that Scott, as general contractor, entered into
7 contracts, agreements, and/or subcontracts with subcontractors and/or others to assist in
8 the construction. (*Id.* at ¶¶ 16-17). In that Amended Complaint, Silverbell alleged that,
9 in late 2008, it discovered a number of defects and latent defects at the Silverbell
10 Apartments and that the damages exceed $7.11 million. (*Id.* at ¶¶ 18-20).

11 Scott then tendered its defense and indemnity to Evanston Insurance Company
12 ("Evanston") subject to a reservation of rights under Evanston CGL Policy No. 01 GLP
13 1003112 (the "Evanston Policy"). (*Id.* at ¶ 23).

14 Lexington issued an Excess Liability Policy No. 4013724, effective January 1,
15 2002 to January 1, 2003, to Robson Communities, Inc. ("Robson") (the "Excess Policy").
16 (*Id.* at ¶ 2). Scott is a named insured in that policy. (*Id.* at ¶ 4). The Evanston Policy is
17 the "underlying policy" to the Excess Policy. (*Id.* at ¶ 43).

18 On July 2, 2012, Robson and Scott provided notice to Lexington that Scott was
19 finalizing a settlement with Silverbell that would result in the exhaustion of the Evanston
20 Policy and would trigger coverage under the Excess Policy issued by Lexington. (*Id.* at ¶
21 24). On July 13, 2012, Lexington requested information from Robson and Scott
22 confirming the exhaustion of the Evanston Policy and any other underlying policies. (*Id.*
23 at ¶ 25). Thereafter, on July 20, 2012, Lexington again requested information confirming
24 the exhaustion of underlying policies and requested confirmation that the subcontractors'
25 policies had also been exhausted. (*Id.* at ¶¶ 26-27). On July 26, 2012, Lexington again
26 requested information concerning the subcontractors' policies and positions taken by
27 ───────────────
28 The Robson Trust owns Scott Homes Multifamily, Inc. (*Id.* at ¶ 9). Steven S. Robson is the president, secretary, and director of Scott Homes Multifamily, Inc. (*Id.* at ¶10).

their respective carriers. (*Id.* at ¶ 28). Lexington never received a response to these requests. (*Id.*at ¶ 29).

On September 19, 2012, Silverbell, Scott, and Evanston agreed to enter into a settlement agreement purporting to resolve the claims asserted against Scott in the state court case for damages arising out of the project, including repair and replacement of defective construction and resulting damages (the "Settlement Agreement"). (*Id.*at ¶¶ 30-31). In that Settlement Agreement, Evanston agreed to pay Silverbell one million dollars, the aggregate limit of its insurance under the Evanston Policy. (*Id.* at ¶ 32). The Settlement Agreement further provided that the one million dollar payment exhausted Evanston's applicable coverage.

Further, Scott and Silverbell agreed to enter into a stipulated judgment against Scott in the amount of six million dollars to be received from subcontractors, subcontractor's insurers, and Scotts' primary and excess insurers (the "stipulated judgment"). (*Id.* at ¶ 34). In Exhibit 1 to the Settlement Agreement, Scott identified eleven subcontractors who unconditionally agreed to defend and indemnify Scott and failed to do so. (*Id.* at ¶ 36). The Excess Policy applies only upon exhaustion of all applicable underlying limits, whether or not collectible. (*Id.* at ¶¶ 46, 67).

As a result of the above allegations, Lexington seeks the following declarations: (1) that the Excess Policy is not currently implicated and Lexington owes no duty to defend Scott Homes (*Id.* at ¶ 74); (2) that it owes no coverage for any amount of the stipulated judgment or any damages sought in the state court case because the damages sought in the state court case are not a result of "property damage" as defined in the Excess Policy (*Id.* at ¶ 81); (3) that it is not liable for property damages that did not occur during the effective dates of the Excess Policy (*Id.* at ¶ 88); (4) that it owes no coverage for any amount of the stipulated judgment or other damages sought not caused by an "occurrence" (*Id.* at ¶ 92); (5) that it owes no coverage for any "property damage exclusions" (*Id.* at ¶ 100); (6) that it owes no coverage for damages excluded by "professional liability exclusions" (*Id.* at ¶ 107); (7) that it owes no damages that were

first incurred prior to the inception of the Evanston or Excess Policies (*Id.* at ¶ 116); (8) that is owes no coverage under a policy in effect prior to January 1, 2002 (*Id.* at ¶ 121); (9) that it owes no coverage for damages as a result of clean up, remediation, abatement, or removal of mold, fungus, or yeast (*Id.* at ¶ 126); (10) that it owes no coverage for damages attributable to breach of contract, breach of a third party beneficiary contract and breach of implied and express warranties causes of action (*Id.* at ¶ 132); (11) that it owes no coverage for damages attributable to "property damages" for the acts of independent contractors that did not procure the requisite insurance (*Id.* at ¶ 137); (12) that, to the extent Silverbell qualifies as an insured under the Excess Policy, no coverage is available for any damages sought in the state court case (*Id.* at ¶ 145); (13) that, as a result of Scott's material breach of duty to cooperate with Lexington, no coverage is available under the Excess Policy (*Id.* at ¶ 153); (14) that, as a result of Scott's failure to obtain Lexington's consent before entering into a settlement agreement, no coverage is available under the Excess Policy (*Id.* at ¶ 158); (15) that, as a result of Scott's failure to obtain permission to transfer its rights under the Excess Policy, no coverage is available under the Excess Policy (*Id.* at ¶ 165); and (16) that, to the extent that stipulated judgment is a product of collusion or is unreasonable, no coverage is available under the Excess Policy (*Id.* at ¶ 173).

### B.   The Counterclaim

In response to the Complaint, Defendant Silverbell filed an answer and counterclaim. In its Counterclaim, Silverbell alleges:

In November 2011, Lexington was informed of the possible excess liability exposure as a result of the state court case. (Doc. 10 at ¶ 8). In March 2012, Silverbell wrote to Lexington to provide Lexington with notice of Silverbell's claim in the state court lawsuit and offered to provide any information to Lexington regarding the claim and the opportunity to appear and participate in a mediation between the parties (*Id.* at ¶ 21). In July 2012, Robson and Scott wrote a letter to Lexington informing it of the intention of Scott to enter into the settlement agreement, including an assignment of

1  Scott's rights under the Excess Policy to Silverbell, and requesting Lexington's coverage
2  position. (*Id.* at ¶ 22). Scott provided Lexington with responses to its requests for
3  information. (*Id.* at ¶ 23). Lexington ignored its insured's liability resulting in the
4  assignment of Scott's rights under the Excess Policy and the settlement agreement. (*Id.*).
5  When Lexington did not respond, Scott, in an effort to avoid a trial set for September 24,
6  2012, which could have resulted in a damage award in excess of $11,000,000, entered
7  into the settlement agreement on September 19, 2012 and assigned its rights under the
8  Excess Policy to Silverbell. (*Id.* at ¶ 24). Scott was not informed of Lexington's refusal
9  to provide coverage until October 5, 2012. (*Id.* at ¶ 28). The Evanston Policy was
10 exhausted, which triggered Lexington's obligations under the Excess Policy. (*Id.* at ¶¶
11 30-31, 44, 49).

12 As a result of these allegations, Silverbell asserts that Lexington (1) breached its
13 duty to defend, provide coverage, or indemnify Scott, which resulted in a breach of
14 contract, and (2) breached its duty of good faith and fair dealing/insurance bad faith by
15 refusing to provide a timely defense and/or coverage position.

**II.     Plaintiff's Motion to Dismiss Silverbell's Counterclaim (Doc. 27)**

17 Lexington argues that Silverbell's breach of contract claim should be dismissed
18 because Silverbell has failed to allege exhaustion of all applicable underlying limits.
19 Lexington argues that, because of the failure to allege exhaustion of applicable
20 underlying limits, Lexington could not have breached its duty to defend or to indemnify
21 Scott and, thus, Silverbell has failed to state a claim upon which relief can be granted.

22 Lexington also argues that Silverbell's insurance bad faith/breach of the duty of
23 good faith and fair dealing claim should be dismissed because Silverbell did not allege
24 that Lexington acted unreasonably and intentionally.

**A.     Legal Standard**

26 To survive a Rule 12(b)(6) motion for failure to state a claim, a counterclaim must
27 meet the requirements of Rule 8. Rule 8(a)(2) requires a "short and plain statement of the
28 claim showing that the pleader is entitled to relief," so that the counter-defendant has

- 5 -

"fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41 (1957)).

A counterclaim must contain sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible on its face." *Id.* Facial plausibility exists if the pleader pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Plausibility does not equal "probability," but plausibility requires more than a sheer possibility that a defendant has acted unlawfully. *Id.*

In deciding a motion to dismiss under Rule 12(b)(6), the Court must construe the facts alleged in a counterclaim in the light most favorable to the drafter of the counterclaim, and the Court must accept all well-pleaded factual allegations as true. *Shwarz v. United States,* 234 F.3d 428, 435 (9th Cir. 2000).

### B. Analysis

With regard to its breach of contract claim, counterclaimant Silverbell alleges that Scott informed Lexington of its intent to enter into a settlement agreement that would trigger Lexington's obligations under the Excess Policy due to exhaustion of the Evanston Policy. Silverbell alleges that, despite numerous notices from Scott, Lexington ignored its obligations to Scott under the policy causing Scott to enter into a Settlement Agreement, assigning its rights to Silverbell to avoid a trial that would result in potential liability of $11,000,000.

Lexington argues that the Court should find that, based on the language of the contract requiring the exhaustion of underlying insurance, Lexington's obligations to Scott under the Excess Policy were not triggered, and, thus, Silverbell cannot state a claim for breach of contract. Silverbell argues that the language of the contract only requires exhaustion of the Evanston Policy, which it alleges had been exhausted.

While the Parties dispute the meaning of the language in the Excess Policy requiring Scott to exhaust underlying insurance, the Court need not address the scope of the exhaustion requirement in the Excess Policy at this time because, even if the Court

were to agree with Lexington's interpretation of the Policy, the breach of contract counterclaim could not be dismissed at this stage of the proceedings.

To determine whether the underlying insurance triggering the Excess Policy was indeed insurance that needed to be exhausted as applied to the state court case and whether such insurance was indeed exhausted, the Court would necessarily have to consider evidence and facts outside of the scope of the allegations in the counterclaim, which the Court is not permitted to do at the motion to dismiss stage. Although Lexington argues that Silverbell's failure to allege that all policies insuring Scott were exhausted is fatal to its claim, Silverbell has not alleged the existence of other policies that would apply to the state court claims. Rather, Silverbell has alleged that the applicable underlying insurance, namely the Evanston Policy, was exhausted. For the Court to find that there are other policies that required such exhaustion, the Court would necessarily have to consider evidence and/or counterdefendant's version of the facts, which is not appropriate at the motion to dismiss stage. Accordingly, taking the facts alleged in Silverbell's Counterclaim in the light most favorable to Silverbell, Silverbell has stated a claim upon which relief can be granted in its breach of contract claim and the motion to dismiss that claim is denied.[2]

Further, with regard to its claim for breach of the covenant of good faith and fair dealing/insurance bad faith, Silverbell alleges that Scott informed Lexington on

---

[2] Further, Lexington challenges most of Silverbell's factual allegations as "conclusory." *See*, *e.g.*, Doc. 35 at 5 (arguing that Silverbell's allegation that the Evanston Policy has been exhausted is conclusory and that the claim should be dismissed because Silverbell "does not (and cannot) point to any facts that it has alleged in the Counterclaim, which refute Lexington's argument that the policy issued by Evanston was not exhausted.") (emphasis in original). At this stage, it is not Silverbell's burden to refute Lexington's arguments. Rather, for the purposes of deciding the motion to dismiss the counterclaim, the Court must accept Silverbell's allegations as true, whether or not they can be proved. As such, the Court finds that these allegations are sufficiently specific to put Lexington on notice of Silverbell's claims and the facts supporting those claims. Further, the fact that Lexington offers controverting facts to challenge counterclaimant's allegations does not make counterclaimant's allegations conclusory, but rather contested. The Court will not resolve such contests at this stage of the litigation.

- 7 -

numerous occasions that Scott believed the Excess Policy was triggered and requested that Lexington provide it coverage or Lexington's position as to coverage. Silverbell alleges that Scott responded to all of Lexington's requests for information, and that, despite the fact that its duties were triggered, Lexington ignored Scott's requests for coverage and refused to provide Lexington's position on coverage before the settlement agreement was executed.

Lexington argues that the position it took with regard to the Excess Policy was reasonable and thus cannot constitute the basis for a bad faith action. Again, the Court cannot conclude that Lexington's position was reasonable without considering evidence and facts outside the allegations in the counterclaim. Thus, construing Silverbell's allegations in the light most favorable to Silverbell, Silverbell has stated a claim upon which relief can be granted for breach of the covenant of good faith and fair dealing/insurance bad faith and the motion to dismiss that claim is denied.

### III. Scott's Motion to Dismiss (Doc. 41)

Defendant Scott argues that it should be dismissed because it assigned all of rights in the Excess Policy to Defendant Silverbell. Defendant Scott further asserts that the fact that Lexington has not stated a claim against Defendant Scott is demonstrated by Lexington's admission in the Joint Case Management Plan that "no claims are being asserted against Scott Homes in this lawsuit [and] Plaintiff only named Scott Homes as a party because plaintiff believes Scott Homes' rights are directly affected by the outcome of litigation." (Doc. 36 at 2 n. 1).

In Response, Lexington argues that it named Scott as a Defendant because it believes that Scott is a necessary and indispensable party pursuant to Federal Rule of Civil Procedure 19. Lexington also reiterates its argument that is has not stated a claim against Scott, but that Scott's interests will be affected by the outcome of the litigation.

Determining whether a party is necessary under Rule 19 largely depends on whether that party's interests will be "adversely affected [by the litigation] in a practical sense." *Continental Ins. Co. of New York v. Cotton*, 427 F.2d 48, 51 (9th Cir. 1970).

In this case, although Lexington denies that it has stated a claim against Scott, Lexington seeks declarations that it owes no coverage under the policy, in part, because (1) Scott assigned its rights under the policy without Lexington's consent; (2) Scott "materially breached its duty to cooperate with Lexington," which, Lexington alleges would preclude coverage; and (3) the Stipulated Judgment entered into between Scott and Silverbell was unreasonable and the result of collusion.  The ultimate remedy that Lexington seeks—to have the Court declare that no one is entitled to coverage under the Excess Policy for the state court case—may not impact Scott because it assigned its interest in the Excess Policy related to the state court case to Silverbell.  However, according to Lexington, for the Court to grant any such relief based on certain claims in Lexington's complaint, the Court would have to make findings that Scott breached its contract with Lexington and/or acted in collusion with Silverbell.[3]  If the Court were to make such findings, there is no doubt that Scott's rights would be adversely affected by the litigation in a practical sense.

Accordingly, based on the allegations in the Complaint, the Court finds that Defendant Scott is a necessary party to this lawsuit and Scott's Motion to Dismiss is denied.

**IV.   Conclusion**

Based on the foregoing,

**IT IS ORDERED** that Plaintiff's Motion to Dismiss Silverbell 290 Limited Partnership's Counterclaim (Doc. 27) is denied.

///

//

/

---

[3] For the purposes of this Order, the Court takes no position as to whether Lexington would actually be entitled to the remedy it seeks based on the allegations in the Complaint.

- 9 -

1     **IT IS FURTHER ORDERED** that Scott Homes Multifamily, Inc.'s Motion to
2  Dismiss (Doc. 41) is denied.
3     Dated this 29th day of May, 2013.

James A. Teilborg
Senior United States District Judge