1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                  **FOR THE DISTRICT OF ARIZONA**

8

9    Lexington Insurance Company,            No. CV-12-02119-PHX-JAT

10                    Plaintiff,             **ORDER**

11   v.

12   Scott Homes Multifamily, Inc. and
     Silverbell 290 Limited Partnership,

13

14                    Defendants.

     Silverbell 290 Limited Partnership,
15   individually and as the assignee of Scott
     Homes Multifamily, Inc.,

16

17                    Counterclaimants,

18   v.

19   Lexington Insurance Company,

20                    Counterdefendant.

21          Pending before the Court are Plaintiff Lexington Insurance Company

22   ("Lexington")'s Motion for Summary Judgment (Doc. 53) and Defendant Silverbell 290

23   Limited Partnership ("Silverbell")'s Motion to Strike (Doc. 81). The Court now rules on

24   the motions.

25   **I.     Motion to Strike**

26          The Court first considers Silverbell's motion to strike because if granted, it would

27   narrow the evidence before the Court in considering Lexington's motion for summary

28   judgment. Lexington's statement of facts in support of its motion for summary judgment

1    includes several attached exhibits. (Doc. 54 Exs. A-P). Silverbell raised evidentiary

2    objections to these exhibits in its controverting statement of facts, (Doc. 69), and

3    Lexington attempted to bolster their admissibility by attaching an affidavit to its reply in

4    support of its motion. (Doc. 78). In the affidavit, Lexington's counsel attempts to

5    authenticate the exhibits by attesting that they are true and correct copies of what they

6    appear to be. (*Id.* at 2-4). Silverbell then filed a motion to strike both the affidavit as well

7    as the exhibits, objecting to their admissibility. (Doc. 81 at 3-4). Lexington contends

8    Silverbell's motion is procedurally improper. (Doc. 83 at 3).

9        **A.      Legal Standard**

10       Arizona Local Rule of Civil Procedure ("Local Rule") 7.2 governs the filing of

11   motions to strike, and provides that "a motion to strike may be filed only if it is

12   authorized by statute or rule . . . or if it seeks to strike any part of a filing or submission

13   on the ground that it is prohibited (or not authorized) by a statute, rule, or court order."

14   L.R.Civ.P. 7.2(m)(1).  "An objection to (and any argument regarding) the admissibility of

15   evidence offered in support of or opposition to a motion must be presented in the

16   objecting party's responsive or reply memorandum and not in a separate motion to strike

17   or other separate filing." *Id.* 7.2(m)(2).

18       **B.      Analysis**

19       Lexington contends that Silverbell's motion to strike is a motion presenting

20   objections to the admissibility of evidence barred under Local Rule 7.2(m). (Doc. 83 at

21   3). Silverbell asserts that Local Rule 7.2(m)(1) authorizes a motion to strike part of a

22   filing that is not authorized by a statute, rule, or court order. (Doc. 81 at 3).

23       The Court need not consider whether Lexington was authorized to file its affidavit

24   with its reply. At the summary judgment stage, a court focuses on the admissibility of the

25   contents of evidence and not its form. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th

26   Cir. 2003). It is sufficient that the "contents of the [exhibits] are admissible at trial, even

27   if the [exhibits themselves] may be inadmissible." *Id.* at 1036. Lexington's affidavit seeks

28   only to convert the exhibits into an admissible form, (Doc. 78 at 2-4), but the Court must

1   consider the exhibits on summary judgment regardless of whether they are admissible in

2   their current form. *See Fraser*, 342 F.3d at 1036-37. Accordingly, to the extent that

3   Silverbell's motion to strike seeks to strike Lexington's affidavit, the Court will deny the

4   motion as presenting an advisory question because the Court must consider the exhibits

5   regardless of whether the affidavit is stricken.

6        Additionally, to the extent that Silverbell's motion to strike seeks to strike

7   Lexington's exhibits themselves, the Court will deny the motion. Local Rule 7.2(m)(2)

8   prohibits motions to strike objecting to the admissibility of evidence. Silverbell's motion

9   objects to the admissibility of Lexington's exhibits and is procedurally improper. *See*

10  *Pruett v. Ariz.*, 606 F. Supp. 2d 1065, 1074 (D. Ariz. 2009). The Court will consider only

11  those evidentiary objections made in Silverbell's controverting statement of facts.

12  **II.**    **Motion for Summary Judgment**

13      **A.**    **Background**

14       Lexington filed this declaratory judgment action seeking a determination that it is

15  not liable to pay Silverbell in satisfaction of a consent judgment Silverbell obtained in

16  prior litigation against Lexington's insured, Scott Homes Multifamily, Inc. ("Scott

17  Homes"). (Doc. 1).

18       The basic facts giving rise to Lexington's action are as follows. Silverbell

19  contracted with Scott Homes for the construction of the Springs at Silverbell Apartments

20  (the "Apartments"). (Doc. 1-1 at 25-26). At all relevant times, Scott Homes was insured

21  under a primary general liability policy (the "Evanston Policy") issued by Evanston

22  Insurance Company ("Evanston").[1] (Doc. 10-2 at 2). Scott Homes was also insured under

23  an excess liability policy issued by Lexington (the "Lexington Excess Policy") that

24  "followed form"[2] to the Evanston policy. (Doc. 1-1 at 2). Additionally, Scott Homes was

---

25       [1] The Evanston Policy has policy number 02GLP1003112. (Doc. 10-3 at 4).

26

27       [2] An excess liability "follow form" policy is "[e]xcess insurance that is subject to all of the terms and conditions of the policy beneath it." *Excess Liability "Follow Form" Policy*, IRMI Risk Mgmt. & Ins. Educ. & Info., http://www.irmi.com/online/insurance-glossary/terms/e/excess-liability-follow-form-policy.aspx (last visited Nov. 25, 2013). An excess liability policy provides "limits in excess of an underlying liability policy" and

28

1    an additional named insured on some of its subcontractors' primary policies. (Doc. 1-4 at

2    2). After the Apartments were built, Silverbell discovered construction defects in the

3    Apartments. (*Id.* at 30).

4            Silverbell sued Scott Homes and its subcontractors for damages. (*Id.* at 25-45).

5    Scott Homes tendered its defense to Evanston, who defended subject to a reservation of

6    rights. (Doc. 68-5 at 2). Lexington declined to defend Scott Homes, asserting that it had

7    not been provided with documentation showing all underlying coverage had been

8    exhausted. (*Id.* at 7); (Doc. 54-2 at 5). Silverbell, Scott Homes, and Evanston

9    subsequently entered into a settlement agreement[3] (the "Settlement Agreement") in which

10   (1) Silverbell and Scott Homes stipulated to a $6 million judgment against Scott Homes;

11   (2) Evanston agreed to pay Silverbell its policy limit of $1 million in exchange for a

12   release from further liability; (3) Silverbell agreed not to execute the judgment against

13   Scott Homes; and (4) Scott Homes assigned to Silverbell all of Scott Homes' rights for

14   claims arising out of the Apartments against certain subcontractors, subcontractors'

15   insurers, primary insurers (other than Evanston), and excess insurers. (Doc. 68-5 at 9-10).

16           The Pima County Superior Court entered judgment for Silverbell and against Scott

17   Homes in the amount of $6 million, as stipulated. (Doc. 54-12 at 2). The judgment stated

18   that the $6 million amount was awarded for "claims related to and/or damages caused by

19   work of" seven subcontractors who Scott Homes had hired to construct the Apartments

20   and provided an itemized breakdown of the award per subcontractor. (*Id.* at 3). After

21   entry of judgment, Lexington filed the present action for a declaration that it is not liable

22   to Silverbell under the terms of its policy. (Doc. 1).

23           **B.    Legal Standard**

24           Summary judgment is appropriate when "the movant shows that there is no

25   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

26   _____

27   "its sole purpose is to provide additional limits of insurance." *Excess Liability Policy*,
     IRMI Risk Mgmt. & Ins. Educ. & Info., http://www.irmi.com/online/insurance-
     glossary/terms/e/excess-liability-policy.aspx (last visited Nov. 25, 2013).

28
     [3] Pursuant to *Damron v. Sledge*, 460 P.2d 997 (Ariz. 1969). (Doc. 68-5 at 8).

1    of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely

2    disputed must support that assertion by . . . citing to particular parts of materials in the

3    record, including depositions, documents, electronically stored information, affidavits, or

4    declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by

5    "showing that materials cited do not establish the absence or presence of a genuine

6    dispute, or that an adverse party cannot produce admissible evidence to support the fact."

7    *Id.* 56(c)(1)(A), (B). Thus, summary judgment is mandated "against a party who fails to

8    make a showing sufficient to establish the existence of an element essential to that party's

9    case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

10   *Catrett*, 477 U.S. 317, 322 (1986).

11        Initially, the movant bears the burden of pointing out to the Court the basis for the

12   motion and the elements of the causes of action upon which the non-movant will be

13   unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to

14   the non-movant to establish the existence of material fact. *Id.* The non-movant "must do

15   more than simply show that there is some metaphysical doubt as to the material facts" by

16   "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.'"

17   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting

18   Fed.R.Civ.P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the

19   evidence is such that a reasonable jury could return a verdict for the non-moving party.

20   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare

21   assertions, standing alone, are insufficient to create a material issue of fact and defeat a

22   motion for summary judgment. *Id.* at 247–48. However, in the summary judgment

23   context, the Court construes all disputed facts in the light most favorable to the non-

24   moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

25       **C.**      **Applicable Underlying Policies**

26        Because the Lexington Excess Policy is an excess liability policy, it provides

27   coverage only after certain underlying policies have been exhausted. The parties dispute

28   which policies must be exhausted before Lexington incurs an obligation to provide

coverage under the Lexington Excess Policy. Lexington contends the applicable underlying policies are the Evanston Policy as well as any policies issued to Scott Homes' subcontractors "under which Scott Homes [qualifies] as an additional insured." (*Id.* at 5). Silverbell argues that the Evanston Policy is the only applicable underlying policy. (Doc. 68 at 19). Accordingly, the Court must first address whether subcontractor policies qualify as underlying policies for the Lexington Excess Policy before determining which, if any, underlying policies have exhausted.

### 1.      Background

The Lexington Excess Policy provides that:

> A.      We will pay on behalf of the **Insured** that portion of the loss which the **Insured** will become legally obligated to pay as compensatory damages (excluding all fines, penalties, punitive or exemplary damages) by reason of exhaustion of all applicable underlying limits, whether collectible or not, as specified in Section II of the Declarations, subject to:
>
> > 1.      the terms and conditions of the **underlying policy** listed in Section IIA of the Declarations, AND
> >
> > 2.      our Limit of Liability as stated in Section 1C of the Declarations.
>
> B.      Except as regards: (1) the premium; (2) the obligation to investigate and defend, including costs and expenses thereto; (3) the limit of liability; (4) the renewal agreement, if any; (5) the notice of **occurrence, claim**, or suit provision; (6) any other provision therein inconsistent with this policy; the provisions of the **underlying policy** are hereby incorporated as part of this policy.

(Doc. 1-1 at 4). The Lexington Excess Policy defines the term "underlying policy" as "understood to mean the policy indicated in Section IIA of the Declarations" and defines "underlying insurance" as "the total limits of all insurance including the **underlying policy** and/or any self-insured retentions excess of which this policy is written, whether recoverable or not recoverable." (*Id.* at 7).

Section II of the Declarations to the Lexington Excess Policy provides:

SECTION II – UNDERLYING INSURANCE

1
2
3
4

      A)   Underlying Company:   Evanston
            Policy Number:   TBD
            Coverage:   GENERAL LIABILITY
            Eff. Date:   01/01/02  Exp. Date: 01/01/03
            Limit:   $1,000,000

B) Total limits of all Underlying Insurance including the underlying policy in excess of which this policy applies:

      $1,000,000 PER OCCURRENCE / PRODUCTS AGGREGATE
      $2,000,000 GENERAL AGGREGATE

(*Id.* at 2).

The parties' dispute concerning these terms in the Lexington Excess Policy arises because the Evanston Policy, although a primary liability policy, provides that it is itself excess insurance under certain conditions:

    4.    Other Insurance.

         If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

         a.    Primary Insurance

             This insurance is primary except when b. below applies. . . .

         b.    Excess Insurance

             This insurance is excess over

             * * *

             (2) Any other valid and collectible insurance available to you covering liability for damages arising out of the premises, operations, products and/or completed operations for which you have been added as an additional insured by an endorsement, or by definition via a contract or agreement, or by any combination thereof.

(Doc. 10-3 at 23).

## 2.    Legal Standard

Under Arizona law, insurance policies, as contracts between insurers and insureds,

1    are construed "to effectuate the parties' intent." *Liberty Ins. Underwriters, Inc. v. Weitz*
2    *Co., LLC*, 158 P.3d 209, 212 ¶ 8 (Ariz. Ct. App. 2007). "Insurance policy provisions
3    must be read as a whole, giving meaning to all terms. If the contractual language is clear,
4    [the Court] will afford it its plain and ordinary meaning and apply it as written." *Id.*
5    (citation omitted). But if a policy "presents conflicting reasonable interpretations," its
6    language is ambiguous. *State Farm Mut. Auto. Ins. Co. v. Wilson*, 782 P.2d 727, 733
7    (Ariz. 1989).

8    ### 3.    Analysis

9    Lexington argues that the Lexington Excess Policy provides excess coverage only
10   upon the exhaustion of both the Evanston Policy as well as the subcontractor policies by
11   the payment of covered claims. (Doc. 53 at 5); (Doc. 77 at 2-3 & n.2). Lexington first
12   argues, though somewhat implicitly, that the subcontractor policies are primary policies
13   as to Scott Homes. (Doc. 53 at 5); (Doc. 77 at 5). Silverbell argues that the subcontractor
14   policies cannot be underlying policies because Scott Homes' risk differed from those of
15   the subcontractors and the defining characteristic of an excess policy is that it insures for
16   the same risk as the underlying policies. (Doc. 68 at 10, 16).

17   Although Silverbell is correct that Scott Homes' *overall* risk was broader than the
18   risk to any one subcontractor, a subcontractor policy naming Scott Homes as an
19   additional insured is a primary policy to Scott Homes because it thus provides Scott
20   Homes with the same protection as the subcontractor against the *subcontractor's*
21   *liability*.[4] *See Wright-Ryan Constr., Inc. v. AIG Ins. Co. of Canada*, 647 F.3d 411, 416
22   (1st Cir. 2011) (contractor who was added as an additional insured on subcontractor's
23   policy had primary coverage through that policy); *Pecker Iron Works of N.Y., Inc. v.*
24   *Traveler's Ins. Co.*, 99 N.Y.2d 391, 393 (2003) (same); *Transcon. Ins. Co. v. Ins. Co. of*
25   *State of Penn.*, 56 Cal. Rptr. 3d 491, 496 (Ct. App. 2007) (same).

26

27   [4] The Court is not determining whether all of the subcontractor policies name
     Scott Homes as an additional insured. Because the Court ultimately concludes that the
     subcontractor policies cannot be underlying insurance to the Lexington Excess Policy, it
28   is sufficient that the Court discuss whether *any* subcontractor policy could qualify as a
     primary policy to Scott Homes.

1        Lexington then contends that because the subcontractor policies are primary

2  policies and all primary policies must be exhausted before triggering excess insurance

3  policies, the subcontractor policies are underlying policies to the Lexington Excess

4  Policy. (Doc. 53 at 6). In support, Lexington cites *American Family Mutual Insurance*

5  *Co. v. Continental Casualty Co.*, 23 P.3d 664 (Ariz. Ct. App. 2001), which held that an

6  excess policy is not triggered until the exhaustion of all primary policies. 23 P.3d at 667.

7  But the issue in that case was the statutorily-defined order of payment in an automobile

8  liability case as between an excess policy to an exhausted primary policy and a separate

9  primary policy. *Id.* at 664-65. Nor does *Virginia Surety Insurance Co. v. RSUI Indemnity*

10  *Co.*, 2009 WL 4282198 (D. Ariz. Nov. 25, 2009), also cited by Lexington, hold that

11  primary policies are always underlying policies. 2009 WL 4282198, at \*4 (citing *Am.*

12  *Family Mut. Ins. Co.*, 23 P.3d at 666) ("an excess insurer's duties . . . are normally not

13  triggered until all *applicable* primary insurance has been exhausted." (emphasis added)).

14  In this vein, Silverbell argues that the only applicable primary insurance is the Evanston

15  Policy. (Doc. 68 at 9).

16        The Ninth Circuit Court of Appeals, applying Arizona law, has declined to

17  establish a bright-line rule for determining whether an excess policy is excess to a

18  particular primary policy or is excess to all primary policies. In *AMHS Insurance Co. v.*

19  *Mutual Insurance Co. of Arizona*, 258 F.3d 1090 (9th Cir. 2001), the court analyzed two

20  excess policies and concluded that one was excess over only the specific primary policies

21  it enumerated while the other was excess to all primary policies. 258 F.3d at 1096, 1100.

22        There, the two primary policies at issue were the "Samaritan policy" and the

23  "MICA policy." *Id.* at 1097. The court began by noting that excess policies that are

24  excess to all primary policies are "written under circumstances where rates were

25  ascertained after giving due consideration to known existing and underlying basic or

26  primary policies." *Id.* (quoting *St. Paul Fire & Marine Ins. Co. v. Gilmore*, 812 P.2d 977,

27  980 (Ariz. 1991)). The court then noted that the first excess policy at issue applied "to

28  losses resulting from an occurrence and exceeding $1 million" and referred to specific

1    underlying policies, including the Samaritan policy, which had a $1 million limit, but did

2    not mention the MICA policy. *Id.* Because the excess policy named specific primary

3    policies and its coverage began upon the exhaustion of the limits of those policies, the

4    court concluded that the excess policy was intended to provide excess coverage of only

5    those policies and not also of the MICA policy. *Id.*

6           The court reached the opposite conclusion with respect to the second excess

7    policy. That policy "repeatedly state[d] that it applie[d] only to losses in excess of $10

8    million" and unlike the other excess policy, did not "purport to attach upon the

9    exhaustion of a specific underlying policy." *Id.* at 1099. Because coverage attached "only

10    after exhaustion of a specified policy amount," the court concluded it was excess of all

11    insurance, including the MICA policy. *Id.* at 1099-1100.

12           In this case, the plain language of the Lexington Excess Policy shows Lexington

13    intended to provide excess coverage of only the Evanston Policy. First, the Lexington

14    Excess Policy in section IIA of its Declarations specifically names only the Evanston

15    Policy as underlying insurance. (Doc. 1-1 at 4). Second, it defines the term "underlying

16    policy" as the policy listed in Section IIA of the Declarations, namely the Evanston

17    Policy. (*Id.* at 7). This alone is sufficient to conclude that the Lexington Excess Policy is

18    excess over only the Evanston Policy.[5]

19           Lexington argues that the Lexington Excess Policy's definition of "underlying

20    insurance" expressly includes other primary policies in addition to the Evanston Policy.

21

---

22           [5] Silverbell submitted the affidavit of Stephen Prater in connection with its

23 response to Lexington's motion. (Doc. 68-3). Mr. Prater opines on the interpretation of the Lexington Excess Policy. (*Id.* at 5-6). Lexington asks the Court to disregard this affidavit because the policy is "undisputedly unambiguous." (Doc. 77 at 5 n.3). The

24 Court agrees with Lexington that the policy is unambiguous and accordingly disregards the affidavit. For the same reasons, the Court also disregards the declaration of Peter

25 Gerstman. (Doc. 68-4).

26           Lexington also correctly points out that to the extent Silverbell frames the legal

27 standard for interpreting the Lexington Excess Policy as not "so as to defeat reasonable expectations of coverage," *see* (Doc. 68 at 9, 15, 16), this standard is inapplicable because the policy is not ambiguous. *See Phoenix Control Sys., Inc. v. Ins. Co. of N. Am.*,

28 796 P.2d 463, 466 (Ariz. 1990); *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 682 P.2d 388, 389 (Ariz. 1984).

1   (Doc. 77 at 3). But Lexington misreads the plain language of the definition, which

2   provides that underlying insurance is "the total limits of all insurance including the

3   **underlying policy** and/or any self-insured retentions excess of which this policy is

4   written, whether recoverable or not recoverable." (Doc. 1-1 at 7). The phrase "the total

5   limits of all insurance . . ." is narrowed by the qualification that the insurance is that

6   "excess of which this policy is written." Thus, this definition does not independently

7   define the scope of coverage. Accordingly, the Court rejects this argument.

8         Lexington also argues that excess coverage is transitive: if the Evanston Policy is

9   excess to the subcontractor policies and the Lexington Excess Policy is excess to the

10   Evanston Policy, then the Lexington Excess Policy must be excess to the subcontractor

11   policies. (Doc. 53 at 5). This interpretation is unreasonable because, again, it would

12   contradict the Lexington Excess Policy's plain language.

13         Specifically, although the Lexington Excess Policy identifies the Evanston Policy

14   as underlying insurance, it conditions Lexington's obligation to pay solely on the

15   exhaustion of underlying *limits* (the limits equal those of the Evanston Policy). *See* (Doc.

16   1-1 at 4). These limits are established in the Declarations as $1 million per occurrence

17   and $2 million general aggregate, and are defined as the "[t]otal limits of all Underlying

18   Insurance including the underlying policy in excess of which this policy applies[.]" (*Id.* at

19   2).

20         Because the Lexington Excess Policy triggers Lexington's coverage only upon the

21   exhaustion of $1 million in underlying limits, the policy cannot be interpreted as excess

22   over the subcontractor policies. Unlike the primary policies at issue in *AMHS Insurance*,

23   each of which provided primary insurance coverage, 258 F.3d at 1093-94, the Evanston

24   Policy and the subcontractor policies *cannot* overlap in coverage: To the extent that a

25   subcontractor policy provides complete coverage for a particular occurrence, the

26   Evanston Policy's "other insurance" clause excludes coverage under the Evanston Policy

27   for that same occurrence. *See* (Doc. 10-3 at 23).

28         Consequently, Lexington's interpretation defeats its obligations under its policy

1    because as long as subcontractor policies paid covered claims, the Evanston Policy could

2    not be exhausted, precluding Lexington's coverage. Even if a subcontractor policy was

3    exhausted in payment of a covered claim, the Evanston Policy provided excess coverage,

4    *and* the Evanston Policy was exhausted, Lexington's suggested interpretation would still

5    defeat Lexington's coverage obligations. In such a case, the total exhausted underlying

6    limits would be greater than $1 million because the Evanston Policy had a $1 million per-

7    occurrence limit and any subcontractor policy must have a limit greater than $0. This

8    would defeat Lexington's obligation to provide coverage after the exhaustion of $1

9    million in underlying limits. Thus, Lexington's interpretation contradicts the plain

10    language of the Lexington Excess Policy.

11         Accordingly, the subcontractor policies are not underlying policies to the

12    Lexington Excess Policy. The Lexington Excess Policy is excess to only the Evanston

13    Policy.[6]

14    **D.    Exhaustion of the Evanston Policy**

15         Because the Evanston Policy is the only applicable underlying policy to the

16    Lexington Excess Policy, to recover under the Lexington Excess Policy, Silverbell must

17    prove that the Evanston Policy was exhausted for covered losses. *See Associated Aviation*

18    *Underwriters v. Wood*, 98 P.3d 572, 595 ¶ 71 (Ariz. Ct. App. 2004). Lexington contends

19    that Silverbell cannot prove the exhaustion of the Evanston Policy because Evanston's $1

20    million payment was in settlement of both covered and uncovered claims. (Doc. 53 at 7).

21    **1.    Background**

22         The Settlement Agreement between Silverbell, Scott Homes, and Evanston

23    provided that Evanston's tender of its policy limits was in full exhaustion of the Evanston

24    Policy:

25               4.1.3  It is understood and agreed by SCOTT, SILVERBELL

26                    and EVANSTON that the EVANSTON PAYMENT is
                       made in response to SCOTT'S demand that

27                    EVANSTON Policy No. 02 GLP 1003112 respond to

28         [6] Lexington's arguments that Silverbell cannot prove that the subcontractor
policies have exhausted are therefore without merit. (Doc. 53 at 8-10).

1
2
3
4

> SILVERBELL's claims relating to the PROJECT and that said payment is applicable to the CLAIMS and the payment fully exhausts all of EVANSTON'S coverage applicable to the PROJECT, including but not limited to the Products/Completed Operations aggregate limit of Evanston Policy No. 02 GLP 1003112 . . . .

5

(Doc. 68-5 at 11).[7] The term "CLAIMS" is defined as follows:

6
7
8
9
10

> 1.7 SILVERBELL filed an action in Pima County Superior Court against SCOTT and various parties involved in the PROJECT captioned *Silverbell 290 Limited Partnership, an Arizona Limited Partnership v. Scott Homes Multifamily, Inc. et al.*, Case No. C20101632 (the "ACTION"), to recover damages arising out of the PROJECT, including repair and replacement of defective construction and resulting damage (the "CLAIMS").

11
12
13
14
15

(*Id.* at 7). Additionally, in its response to Lexington's motion, Silverbell has submitted the affidavit of Phyllis Modlin, an Executive Claims Examiner at Evanston's claims services manager, who executed the Settlement Agreement on behalf of Evanston. (*Id.* at 1). She declares in her affidavit that Evanston tendered its policy limit to Scott Homes "pursuant to its obligations under Policy No. 02 GLP 1003112." (*Id.* at 2).

16

### 2. Analysis

17
18
19
20

Because the Settlement Agreement explicitly provided that Evanston tendered its policy limit in exhaustion of the Evanston Policy and Ms. Modlin's affidavit confirms that Evanston paid for covered damages (". . . pursuant to its obligations . . ."), the Court

21
22
23
24
25

---

[7] Lexington omits the latter half of this sentence in its statement of facts in support of its motion as well as in the motion itself. (Doc. 54 at 5); (Doc. 53 at 7-8). Lexington places a period following "CLAIMS" such that the sentence, as Lexington quotes it, appears to not contain the language concerning the payment fully exhausting Evanston's coverage under the Evanston Policy. There is no ellipsis to indicate this omission.

26
27
28

In *Rice v. Hamilton Oil Corp.*, 658 F. Supp. 446 (D. Colo. 1987), similar conduct was sanctioned under Federal Rule of Civil Procedure ("Rule") 11. There, the plaintiffs selectively omitted the last clause of a sentence, and the court granted sanctions against counsel, noting that the attorney "knew or should have known that his partial quotes, taken out of context would mislead the Court if left uncorrected." 658 F. Supp. at 450. Because Silverbell has not raised this issue, the Court merely admonishes Lexington to ensure its quotations are truthful.

1    concludes that the Evanston Policy has been exhausted.[8]

2          Lexington attempts to construe the Settlement Agreement as including payment

3    for uncovered damages because the term "CLAIMS" is defined as including "repair and

4    replacement of defective construction and resulting damage." (Doc. 53 at 8); (Doc. 77 at

5    4-5). Lexington argues that construction defects of this type cannot satisfy the definition

6    of "occurrence" in the Evanston Policy; thus, Evanston must have paid on uncovered

7    claims. Therefore, Lexington concludes that the Evanston Policy was not exhausted.

8    (Doc. 53 at 8). Although Lexington is bound by the terms of the Evanston Policy because

9    the Lexington Excess Policy incorporates those terms, Lexington is not bound by

10   Evanston's coverage decision. *See Shy v. Ins. Co. of the State of Penn.*, 528 F. App'x 752,

11   754 (9th Cir. 2013). But similarly, Lexington may not attempt to relitigate Evanston's

12   coverage decision. *See Edward E. Gillen Co. v. Ins. Co. of the State of Penn.*, 2011 WL

13   1694431, at *4 (E.D. Wis. May 3, 2011) ("[A]n excess liability insurer cannot avoid or

14   reduce liability under its own policy by challenging a separate insurer's decision to settle

15   or pay out claims at a prior layer of insurance."). Lexington's attempt to draw legal

16   conclusions from a few words ("defective construction and resulting damage") fails to

17   establish as a matter of law that Evanston paid on uncovered claims. The Evanston Policy

18   has exhausted by Evanston's payment of covered claims.

19         **E.    Coverage under the Lexington Excess Policy**

20         Finally, Lexington argues that even if all underlying insurance policies have been

21   exhausted, triggering the Lexington Excess Policy, Silverbell is not entitled to recover the

22   portion of the judgment allocable to Scott Homes' liability for subcontractors Design

23   

24       [8] Lexington disputes the propriety of Ms. Modlin's affidavit, labeling it "self-serving" and as setting forth only a legal conclusion. (Doc. 77 at 5). The Evanston Policy's exhaustion is a fact, not a legal conclusion, because whether the Evanston Policy

25   has been exhausted is not an ultimate issue in this case. Rather, the ultimate legal issue is whether Lexington is liable to Silverbell under the Lexington Excess Policy. Thus, the

26   affidavit is not the kind of "self-serving" affidavit that should be disregarded in ruling on a motion for summary judgment. *Cf. Hansen v. United States*, 7 F.3d 137, 138 (9th Cir.

27   1993). Moreover, the affidavit does not summarily state that the Evanston Policy is exhausted but instead sets forth facts of which Ms. Modlin has personal knowledge as the

28   claims handler for the claim that caused payment of full policy limits of the Evanston Policy.

1   Plastering, Inc. ("Design"); Gypsum Floor Masters, Inc. ("Gypsum"); Littleton Roofing

2   Company of Arizona ("Littleton"); and Structural I Company of Arizona ("Structural").

3   (Doc. 53 at 10).

4                           **1.      Background**

5          The Evanston Policy limits coverage for property damage arising out of the act of

6   independent contractors:

7          It is hereby understood and agreed that no Insurance coverage
           is provided under this policy to defend or indemnify any
8          insured for "bodily injury" or "property damage" arising out
           of acts of Independent Contractors unless you meet the
9          following conditions:

10                 You will obtain certificates of insurance from all
                   independent contractors providing evidence of:
11

12                 1.    Limits of liability equal to or greater than the
                         coverages provided by this policy;

13                 2.    Commercial General Liability coverage equal to
                         or broader than the coverages provided by this
14                       policy.

15                 3.    Workers      Compensation      Insurance      in
                         compliance with the statutes of the applicable
16                       states.

17                 4.    Independent Contractors must name the Named
                         Insured as an additional insured.
18
           Failure to comply with this condition will exclude coverage
19         for acts of Independent Contractors.

20
     (Doc. 10-2 at 19). Scott Homes obtained certificates of insurance from Design, Gypsum,
21
     Littleton, and Structural, providing evidence of insurance in amounts necessary to satisfy
22
     the Evanston Policy's requirements and naming Scott Homes as an additional insured.[9]
23
     (Doc. 68-2 at 6-7, 9-10, 12-13, 15, 17-19). Despite the certificates of insurance, not all of
24
     the subcontractors' insurers defended Scott Homes against Silverbell's claims. The
25
     recitals to the Settlement Agreement state:
26   ─────────────────────
27         [9] Some of the certificates do not provide evidence of workers' compensation
     insurance. (Doc. 68-2 at 7, 9-10, 12-13, 15, 19). Because Lexington does not allege that
28   the claims for damages involved workers' compensation, this has no bearing on the
     merits of Lexington's motion.

                                           - 15 -

> To date, none of the SUBCONTRACTORS' INSURERS has accepted unconditionally its defense and indemnity obligations owed to SCOTT pursuant to its respective insurance policies. Certain of SUBCONTRACTORS' INSURERS have agreed to share a portion of SCOTT'S defense costs to date with EVANSTON under reservation, those insurers are set forth in **Exhibit "5"** to this Agreement.

(Doc. 1-4 at 3). Exhibit 5 to the Settlement Agreement is captioned "Table of Subcontractors' Insurers Accepting the Defense of SCOTT" and lists subcontractors and their insurers. Design, Gypsum, Littleton, and Structural are not listed.

The consent judgment against Scott Homes provided that of the $6 million judgment amount, $2,337,945 was allocated to the work of Design, $371,142 for Gypsum, $1,499,145 for Littleton, and $700,542 for Structural. (Doc. 54-12 at 3).

### 2. Analysis

Lexington contends that, even if all policies have been exhausted, the failure of Design, Gypsum, Littleton, and Structural to "procure insurance" for Scott Homes excludes their liability from coverage under the Evanston Policy. (Doc. 53 at 10-11). Because the Lexington Excess Policy follows form to the Evanston Policy, Lexington asserts that $4,908,774, the portion of the judgment allocable to property damage arising out of the acts of Design, Gypsum, Littleton, and Structural, is not covered under the Lexington Excess Policy. (*Id.* at 11).

This argument is an attempt to add terms to the Evanston Policy. The policy provides that Scott Homes must "obtain certificates of insurance" from independent contractors providing evidence of primary insurance covering Scott Homes. (Doc. 10-2 at 19). The subcontractors insurers' failure to defend Scott Homes does not equate to Scott Homes not obtaining certificates of insurance, the latter being all that the Evanston Policy requires. Accordingly, the Court rejects this argument.[10]

---

[10] The Court notes that Silverbell has failed to provide Gypsum's certificate of insurance for July 1, 2002 to July 1, 2003, which overlaps with the period from January 1, 2002 to January 1, 2003 during which the Evanston Policy and Lexington Excess Policy were effective. *See* (Doc. 1-1 at 2); (Doc. 10-2 at 2); (Doc. 68 at 12). But because Lexington confines its argument to the interpretation of the Evanston Policy and does not claim any defects in the certificates themselves, (Doc. 77 at 8-9), Silverbell's omission

1

**F.      Silverbell's Evidentiary Objections**

2

In its response, Silverbell raises numerous objections to Lexington's evidence

3

submitted in support of its motion for summary judgment. *See* (Doc. 69). Because the

4

Court has not found any of the evidence to which Silverbell objects to be relevant to its

5

ruling on Lexington's motion, the Court need not address these objections.

6

**III.    CONCLUSION**

7

For the foregoing reasons,

8

**IT IS ORDERED** denying Silverbell's Motion to Strike (Doc. 81).

9

**IT IS FURTHER ORDERED** denying Lexington's Motion for Summary

10

Judgment (Doc. 53).

11

Dated this 22nd day of January, 2014.

12

13

14

_____

15

James A. Teilborg
Senior United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

does not undermine its arguments.