**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lexington Insurance Company, | No. CV-12-02119-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Scott Homes Multifamily, Inc. and Silverbell 290 Limited Partnership, | |
| Defendants. | |
| Silverbell 290 Limited Partnership, individually and as the assignee of Scott Homes Multifamily, Inc., | |
| Counterclaimants, | |
| v. | |
| Lexington Insurance Company, | |
| Counterdefendant. | |

Pending before the Court are Plaintiff's Motion to Reopen Discovery (Doc. 310),[1] Plaintiff's Motion for Summary Judgment (Doc. 281), Defendants/Counterclaimants Silverbell 290 Limited Partnership and Scott Homes Multifamily, Inc.'s Motion for

---

[1] Plaintiff's motion violates Local Rule of Civil Procedure 7.2(e), which states that "[u]nless otherwise permitted by the Court, a motion including its supporting memorandum . . . may not exceed seventeen (17) pages, exclusive of attachments and any required statement of facts." Plaintiff filed a separate motion and supporting memorandum totaling in excess of seventeen pages. Although, for the reasons that follow, the Court denies Plaintiff's motion on its merits, the Court alternatively denies the motion as procedurally improper.

Summary Judgment/Summary Adjudication (Doc. 273), Plaintiff's Motion for Violation of Rule 11 and for Sanctions (Doc. 298), and Plaintiff's Notice of Errata and Motion for Leave to Replace Incorrectly-Filed Motion for Violation of Rule 11 (Doc. 303). The Court now rules on the motions.

## I.   Background

The Court incorporates its summary of the facts of this case from its ruling on Plaintiff Lexington Insurance Company ("Lexington")'s first motion for summary judgment:

> Lexington filed this declaratory judgment action seeking a determination that it is not liable to pay Silverbell in satisfaction of a consent judgment Silverbell obtained in prior litigation against Lexington's insured, Scott Homes Multifamily, Inc. ("Scott Homes").
>
> The basic facts giving rise to Lexington's action are as follows. Silverbell contracted with Scott Homes for the construction of the Springs at Silverbell Apartments (the "Apartments"). At all relevant times, Scott Homes was insured under a primary general liability policy (the "Evanston Policy") issued by Evanston Insurance Company ("Evanston"). Scott Homes was also insured under an excess liability policy issued by Lexington (the "Lexington Excess Policy") that "followed form" to the Evanston policy. Additionally, Scott Homes was an additional named insured on some of its subcontractors' primary policies. After the Apartments were built, Silverbell discovered construction defects in the Apartments.
>
> Silverbell sued Scott Homes and its subcontractors for damages [(the "Underlying Lawsuit")]. Scott Homes tendered its defense to Evanston, who defended subject to a reservation of rights. Lexington declined to defend Scott Homes, asserting that it had not been provided with documentation showing all underlying coverage had been exhausted. Silverbell, Scott Homes, and Evanston subsequently entered into a settlement agreement (the "Settlement Agreement") in which (1) Silverbell and Scott Homes stipulated to a $6 million judgment against Scott Homes; (2) Evanston agreed to pay Silverbell its policy limit of $1 million in exchange for a release from further liability; (3) Silverbell agreed not to execute the judgment against Scott Homes; and (4) Scott Homes assigned to Silverbell all of Scott Homes' rights for claims arising out of the Apartments against certain subcontractors, subcontractors' insurers, primary insurers (other than Evanston), and excess insurers.
>
> The Pima County Superior Court entered judgment for Silverbell and against Scott Homes in the amount of $6

million, as stipulated [(the "Stipulated Judgment")]. The judgment stated that the $6 million amount was awarded for "claims related to and/or damages caused by work of" seven subcontractors who Scott Homes had hired to construct the Apartments and provided an itemized breakdown of the award per subcontractor. After entry of judgment, Lexington filed the present action for a declaration that it is not liable to Silverbell under the terms of its policy.

*Lexington Ins. Co. v. Scott Homes Multifamily, Inc.*, 2014 WL 231989, at *2 (D. Ariz. Jan. 22, 2014) (citations and footnotes omitted).

Lexington filed its first motion for summary judgment in June 2013 while discovery in this case was ongoing. (Doc. 53). The Court denied that motion, determining that the Lexington Excess Policy was excess to only the Evanston Policy and the Evanston Policy was exhausted in the payment of covered claims. (Doc. 159).

## II.     Motion to Reopen Discovery

The Court first rules on the motion to reopen discovery because, if granted, the Court would have to reset the dispositive motion deadline, deny as moot the pending cross-motions for summary judgment, and permit further discovery as well as the filing of new dispositive motions. Lexington moves to reopen discovery to compel Defendant Silverbell 290 Limited Partnership ("Silverbell") to produce additional documents that Silverbell allegedly improperly refused to produce.

### A.     Background

#### 1.     Discovery in this Case

Lexington's First Amended Complaint (Doc. 270) alleges, among other claims, that the Settlement Agreement and the resulting Stipulated Judgment between Silverbell and Scott Homes are products of collusion because the two entities share common ownership. (Doc. 270 at 30). The Court's Rule 16 Scheduling Order set a discovery deadline of February 7, 2014 for all claims. (Doc. 40). The Court later extended this deadline several times at the parties' requests. *See* (Doc. 82) (extending discovery deadline to March 7, 2014); (Doc. 200) (extending deposition discovery only to March 21, 2014); (Doc. 266) (extending deposition discovery to April 4, 2014 only for the

purpose of taking Lexington's Rule 30(b)(6) deposition regarding certain topics). The Court also extended the dispositive motion deadline to May 16, 2014. (Doc. 266).

During discovery, Lexington propounded to Silverbell a set of requests to produce documents. Specifically, Lexington requested:

> 30. All Documents and Communications Concerning the Settlement.

> 31. All Documents Concerning the dates on which You negotiated the Settlement and/or discussed settlement of the Underlying Lawsuit with Scott Homes and/or Evanston.

(Doc. 204-1 at 9).

Lexington also requested from Scott Homes:

> 40. All Communications Concerning the Settlement.

> 41. All Documents Concerning the dates on which You negotiated the Settlement and/or discussed settlement of the Underlying Lawsuit with Silverbell and/or Evanston.

(*Id.* at 20).

Silverbell objected to Lexington's request #30 on the grounds that it was vague, ambiguous, and overbroad. (*Id.* at 26). Silverbell contended that the request did not specify the persons between whom the requested communications took place. It also disputed the relevance of the requested documents and asserted that Lexington's request sought documents protected by "attorney-client privilege, the work product documents, a premature disclosure of expert opinions, and/or any other privilege or protection." (*Id.* at 27). Silverbell responded that, other than the documents previously produced in the Underlying Lawsuit, it would not produce "any documents responsive to Request No. 30 at this time given the above referenced objections and the overbroad nature of this request." (*Id.*)

Silverbell similarly objected to Lexington's request #31, contending it was vague, ambiguous, and overbroad because it was unclear as to which documents Lexington referred. (*Id.*) Silverbell also disputed relevance and asserted that Lexington's request sought documents protected by "attorney-client privilege, the work product documents, a

premature disclosure of expert opinions, and/or any other privilege or protection." (*Id.*) Silverbell responded that, other than the documents previously produced in the Underlying Lawsuit, it would not produce "any documents responsive to Request No. 31 at this time given the above referenced objections and the overbroad nature of this request." (*Id.*)[2]

Lexington and Silverbell engaged in a meet-and-confer process both orally and in writing concerning Lexington's requests for production and Silverbell's position on the requests. (Doc. 314 ¶ 26). As part of this process, Lexington's counsel wrote a letter to Silverbell's counsel in which Lexington identified its request #30 to Silverbell and request #40 to Scott Homes as seeking all communications from anyone on behalf of Silverbell or Scott Homes with any third party concerning the Settlement Agreement between Silverbell and Scott Homes. (Doc. 321-1 at 4). Lexington identified these requests as including communications between the attorneys for Silverbell and Scott Homes and to any other party or attorney in the Underlying Lawsuit. (*Id.*) Lexington also identified its request #31 to Silverbell and request #41 to Scott Homes as similar to requests #30 and #40 "in that they seek communications between the parties during their negotiations of the settlement between Silverbell and Scott Homes." (*Id.*)

Silverbell sent supplemental responses to Lexington's requests #30 and #31 in which Silverbell objected that these requests called for the production of documents protected by mediation or settlement privileges. (Doc. 314-2 at 34-35).[3] Silverbell produced a privilege log identifying the documents it was withholding in response to Lexington's request. (*Id.*)

Lexington then initiated a discovery dispute with the Court concerning, among other issues, whether communications leading up to executed settlement agreements are discoverable. *See* (Doc. 192). After the Court's ruling on the scope of the mediation

---

[2] Scott Homes responded to Lexington's requests in a substantially identical manner to that of Silverbell. *See* (Doc. 204-1 at 35-36). Silverbell and Scott Homes share counsel in the present case.

[3] Scott Homes answered similarly. *See* (Doc. 321-2 at 96).

privilege, (Doc. 239 at 5, 19-21), Silverbell produced additional documents, (Doc. 312-1 at 122-229).

### 2. Discovery in the Underlying Lawsuit

Scott Homes' subcontractors, defendants in the Underlying Lawsuit, issued requests for production to Silverbell in which the subcontractors asked for, among other copies, copies of all communications involving Silverbell and Scott Homes' counsel regarding the Settlement Agreement and the Stipulated Judgment against Scott Homes; all communications involving Evanston and its counsel regarding the settlement and assignment of Scott Homes' rights to Silverbell; all communications involving Steven Robson (who owned interests in both Silverbell and Scott Homes), Scott Homes' counsel, and Silverbell regarding the settlement and assignment of Scott Homes' rights to Silverbell; and all communications regarding settlement negotiations and the allocation to Scott Homes' subcontractors in the Stipulated Judgment. (Doc. 312-1 at 5). In response, Silverbell asserted attorney-client privilege and produced a privilege log for documents that Silverbell alleged were privileged (the "Privileged Documents"). (*Id.* at 92).

The resulting discovery dispute was referred to a special master who, in June 2014, issued a report and recommendation. (*Id.* at 1). The special master recommended a finding that Silverbell and Scott Homes had impliedly waived the attorney-client privilege with respect to the Privileged Documents by entering into the Settlement Agreement because Silverbell had to prove both that Scott Homes diligently defended the lawsuit and there was no collusion between Silverbell and Scott Homes in entering into the Settlement Agreement and Stipulated Judgment. (*Id.* at 5-6). The court adopted the special master's recommendations and ordered the production of the Privileged Documents. (*Id.* at 69).

All but one of Scott Homes' subcontractors settled with Silverbell prior to trial. The trial began on September 25, 2014, and Lexington attempted to attend the proceedings so that it could obtain copies of the communications listed in Silverbell's privilege log, but the court sealed the proceedings and barred Lexington from the

courtroom. (Doc. 312 at 2-4). The court also sealed the transcripts. (*Id.* at 3-4). Lexington petitioned the Arizona Court of Appeals for a special action vacating the sealing of the courtroom. The trial settled after the first day and before the trial court had ruled on the admissibility of the attorney-client privileged communications. (Doc. 314 at 5). Lexington later amended its special action petition to request that the transcripts be unsealed; the Arizona Court of Appeals ultimately declined to exercise jurisdiction.

On October 15, 2014, Lexington filed its motion to reopen discovery with the Court. (Doc. 311).

### B.    Legal Standard

A motion to reopen discovery is a motion to modify the discovery deadline set in the Court's scheduling order pursuant to Federal Rule of Civil Procedure ("Rule") 16. *See Bleek v. Supervalu, Inc.*, 95 F. Supp. 2d 1118, 1120 (D. Mont. 2000); *see also Yeager v. Yeager*, 2009 WL 1159175, at *2 (E.D. Cal. Apr. 29, 2009). Rule 16(b)(4) permits a scheduling order to be modified only upon a showing of good cause by the party seeking amendment. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). In the context of motions to reopen discovery, the Ninth Circuit Court of Appeals ("Court of Appeals") has held that good cause requires the movant to show it "diligently pursued its previous discovery opportunities" and that allowing additional discovery will preclude summary judgment. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1026 (9th Cir. 2006) (citing *Panatronic USA v. AT&T Corp.*, 287 F.3d 840, 846 (9th Cir. 2002)).

The Court of Appeals has enumerated several factors that a court may consider in deciding whether to reopen discovery: "1) whether trial is imminent, 2) whether the request is opposed, 3) whether the non-moving party would be prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and 6) the likelihood that the discovery will lead to relevant evidence." *U.S. ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512,

1526 (9th Cir. 1995), *vacated on other grounds sub nom. Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939 (1997). "Whether to reopen discovery rests in the court's sound discretion." *Bleek*, 95 F. Supp. 2d at 1120 (citing *U.S. ex rel. Schumer*, 63 F.3d at 1526).

### C.   Analysis

Before the Court turns to the merits of Lexington's motion, it must first address whether Lexington requests relief under the appropriate Federal Rule of Civil Procedure.

### 1.   Rule 56(d)

Although a motion to reopen discovery is a motion to modify the Rule 16 scheduling order, Lexington instead cites Rule 56(d) as the basis for its motion. (Doc. 310 at 2). Rule 56(d) permits a court to grant relief to a party opposing summary judgment on the basis that the nonmovant is unable to present facts necessary to its opposition:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d) (formerly numbered as 56(f)).

Because a party may move for summary judgment while discovery is spending, Rule 56(d) "provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th Cir. 2002). The rule applies "where the nonmoving party has not had the *opportunity* to discover information that is essential to its opposition." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (emphasis added) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)).

Rule 56(d) "is not meant to re-open discovery in general, to obtain information that is already in the party's possession, or to merely support evidence that is already in the party's possession." *Slama v. City of Madera*, 2012 WL 1067198, at *2 (E.D. Cal.

Mar. 28, 2012); *see also Dumas v. Bangi*, 2014 WL 3844775, at *2 (E.D. Cal. Jan. 23, 2014) ("Rule 56(d) does not reopen discovery; rather it forestalls ruling on a motion for summary judgment in cases where discovery is still open and provides the prospect of defeating summary judgment.").

Thus, Lexington's motion is improper under Rule 56(d), and the Court instead treats the motion as one under Rule 16.

### 2.      Lexington's Diligence

Lexington argues the Court should reopen discovery to permit Lexington to discover evidence that could defeat Silverbell's motion for summary judgment on Lexington's claims of fraud and collusion because Lexington learned only after the close of discovery that Silverbell did not comply with Lexington's requests for production. (Doc. 311 at 2, 10). Lexington has the burden of proving that it "diligently pursued its previous discovery opportunities." *Cornwell*, 439 F.3d at 1026.

Lexington has not shown that it diligently pursued its previous discovery opportunities in this case. Because Lexington learned of the existence of the Privileged Documents after the cutoff of discovery in this case, Lexington knew that it could use these documents only if it filed a motion to reopen discovery. Yet Lexington waited four months from June to October before filing such a motion. During these four months, the parties fully briefed their dispositive motions. The Court can only infer from Lexington's delay that Lexington sought to gain a tactical advantage from reading the fully-briefed cross-motions before it decided whether to pursue using the Privileged Documents. Such dilatory tactics are not diligence.

Lexington attempts to show diligence by pointing to its efforts in the Underlying Lawsuit to obtain the Privileged Documents. (Doc. 311 at 7). It argues that it made diligent efforts because it "made every conceivable effort to obtain the evidence in the underlying action." (*Id.* at 2). Lexington points to its September 2014 efforts to attend the trial in the Underlying Lawsuit to obtain information from the Privileged Documents and its filing of a petition for special action with the Arizona Court of Appeals. (*Id.* at 8-11).

Lexington reiterates that it, in essence, tried its hardest to obtain the information in the Underlying Lawsuit. (*Id.* at 11-13).

Lexington confuses diligence in obtaining physical possession of documents with diligence in pursuing discovery. As Lexington's motion demonstrates, a party can use the discovery process to request copies of documents not yet in the requesting party's possession. Lexington did not have to seek copies of the Privileged Documents in the Underlying Lawsuit prior to filing a motion to reopen discovery. Thus, Lexington's four-month attempt to obtain the Privileged Documents through the Underlying Lawsuit bears no relationship to Lexington's pursuit of discovery opportunities in the present case. Lexington is not seeking to reopen discovery in the Underlying Lawsuit. Rather, it seeks to reopen discovery in *this* case. Thus, Lexington must demonstrate its diligence in pursuing discovery in *this* case. This it has failed to do.

Accordingly, the Court will deny Lexington's motion to reopen discovery.

## III.   Motions for Summary Judgment

### A.   Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A), (B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the

motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

Finally, when multiple parties submit cross-motions for summary judgment, the Court considers each motion on its own merits but must consider all of the evidence presented in determining whether a genuine issue of material fact exists. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## B.   Lexington's Motion for Summary Judgment

Lexington moves for summary judgment on its claim for a declaratory judgment that it is not liable to Silverbell under the terms of the Lexington Excess Policy as well as on Silverbell's counterclaims for bad faith and punitive damages. (Doc. 281 at 2). As an initial matter, Silverbell correctly points out in its response to Lexington's motion that Lexington's motion exceeds the seventeen page limit prescribed by Local Rule of Civil Procedure ("Local Rule") 7.2(e)(1). Subtracting the caption and certificate of service from Lexington's motion, the Court finds the motion to be eighteen pages in length. Accordingly, the Court will not consider the eighteenth page of Lexington's motion.[4]

---

[4] As the eighteenth page contains only a conclusion paragraph, this does not affect the Court's consideration of the merits.

1.      **Breach of the Lexington Excess Policy**

Lexington argues that Scott Homes breached several provisions of the Lexington Excess Policy when it entered into the Settlement Agreement and the law does not excuse these breaches. (Doc. 281 at 6).

a.      **Background**

The Lexington Excess Policy provides that it follows the conditions and limitations of the Evanston Policy:

> 1. Following Form – It is agreed that this policy, except as herein stated, is subject to all conditions, agreements and limitations of and shall follow the **underlying policy/ies** in all respects . . . .

(Doc. 270-1 at 8). Both policies contain cooperation clauses:

> [T]he first Named Insured and any other involved **Insured** must:
>
> . . .
>
> c) cooperate with us in the investigation, settlement or defense of the claim or suit . . . .

(*Id.* at 9) (Lexington Excess Policy).

> 2. Duties In the Event of Occurrence, Offense, Claim or Suit.
>
> . . .
>
> c. You and any other involved Insured must:
>
> . . .
>
> (3) Cooperate with us in the investigation, settlement or defense of the claim or "suit" . . . .

(Doc. 270-2 at 49) (Evanston Policy).

Scott Homes tendered its defense to Lexington on multiple occasions prior to the execution of the Settlement Agreement, beginning on November 18, 2011. (Doc. 282 ¶ 13). Lexington acknowledged a tender but never formally responded to Scott Homes. (Doc. 10-4 at 2). On March 22, 2012, Silverbell advised Lexington of an upcoming mediation scheduled in the case and of Silverbell's intent to make a four million dollar

settlement demand prior to the mediation; Silverbell noted its willingness to enter into a *Damron* agreement if Lexington declined to participate in settlement negotiations and invited Lexington to so participate. (*Id.* at 3). In addition to mediation on April 26, 2012, the parties held a second mediation on June 29, 2012, Lexington attended the latter. (Doc. 282 ¶¶ 25, 27).

On July 2, 2012, Scott Homes advised Lexington by letter that Scott Homes, Silverbell, and Evanston were finalizing the Settlement Agreement and this would "result in the exhaustion of the underlying Evanston Primary Policy and trigger Lexington's obligation defend [sic] Scott Homes . . . in this case." (*Id.* at 6). Scott Homes asked for Lexington to notify Scott Homes in writing no later than July 13, 2012 as to whether Lexington would defend Scott Homes, and stated that Lexington's failure to respond or to disclose its coverage position would result in Scott Homes proceeding to discuss a settlement with Silverbell that "incorporates a Damron agreement and assignment of rights against Lexington/Chartis." (*Id.*)

On August 31, 2012, Lexington sent a letter to Scott Homes in which it acknowledged that there was a "potential for coverage" under the Lexington Excess Policy, subject to a reservation of rights, but in which it also stated that "[w]e currently have no information indicating that all applicable underlying limits are exhausted, and coverage under the Lexington Policy therefore is not implicated at this time." (Doc. 283-1 at 96). Lexington reiterated that the purpose of its letter was to advise Scott Homes of "potential coverage issues and to reserve all of Lexington's rights and defenses under the Lexington Policy and at law, including the right to deny coverage, in the event that Scott Homes' underlying insurers pay or are held liable to pay the full amount of their policies' limits of liability." (*Id.* at 97). Lexington also reiterated that until the underlying policies exhausted, it had no duty to defend Scott Homes. (*Id.*)

On September 12, 2012, Scott Homes sent a letter to Lexington advising that Scott Homes and Silverbell had agreed to enter into the Settlement Agreement and that "[t]his Agreement exhausts the applicable Evanston policy." (Doc. 10-4 at 24). Counsel also

1   explained in this letter:

2           The Agreement also assigns Scott Homes' rights against
            Lexington, which at this point is in the form of a *Damron*
3           agreement, unless Lexington agrees to step in and defend the
            interests of Scott Homes. Given your significant involvement,
4           and the involvement of counsel retained by Lexington, you
            are well aware that the trial in this case will begin on
5           September 25, 2012 . . . . The Agreement provides for
            Lexington to avoid a *Damron* situation if it agrees to defend
6           and indemnify Scott Homes. The agreement has been
            circulated for execution. We will provide an executed copy to
7           you shortly. Please provide your position on or before 12:00
            p.m., PST, Monday, September 24, 2012.

8

9   (*Id.*) (emphasis removed).

10          The parties to the Settlement Agreement executed it on September 19, 2012. (Doc.

11  270-4 at 2). The Settlement Agreement provides that Lexington had until October 1, 2012

12  to reconsider its refusal to "unconditionally defend and/or indemnify" Scott Homes and

13  that there would be no assignment of rights against Lexington if it agreed to

14  unconditionally defend and indemnify Scott Homes. (*Id.* at 4). That same day, the court

15  in the Underlying Lawsuit agreed to continue the trial so that Lexington and Scott

16  Homes' subcontractors could have time to review the Settlement Agreement and decide

17  whether they would defend and indemnify Scott Homes. (Doc. 289-9 at 3; Doc. 289-10 at

18  17; Doc. 289-11 at 13). Lexington received a copy of the executed Settlement Agreement

19  on September 20, 2012. (Doc. 289-23 at 2). Because Lexington needed more time to

20  review the Settlement Agreement, Scott Homes extended the deadline for Lexington to

21  consider its position to October 9, 2012. (Doc. 289-12 at 2-3). On September 27, 2012,

22  Scott Homes sent a letter to Lexington providing additional information that Lexington

23  had previously requested. (Doc. 283-1 at 114).

24          On October 5, 2012, Lexington wrote to Scott Homes and acknowledged receipt

25  of Scott Homes' past correspondence and the executed Settlement Agreement. (Doc. 289-

26  7 at 2-3). Lexington advised Scott Homes that Lexington believed not all underlying

27  insurance to the Lexington Excess Policy was exhausted and that although Evanston had

28  paid its policy limits, Lexington had not determined that Evanston's payment was for the

payment of covered claims. (*Id.* at 3). Lexington stated that:

> Because the correspondence dated September 27, 2012 makes clear that not all underlying insurance has exhausted; the Settlement Agreement, provided as an attachment to the September 20, 2012 email, indicates that the amounts paid may not be in the payment of covered claims; and the correspondence dated October 2, 2012 does not contradict either conclusion, the Lexington Excess Policy is not presently implicated by the underlying lawsuit. Accordingly, Lexington has no present obligation to either defend or indemnify Scott Homes, and will not, therefore, agree to provide Scott Homes with an unconditional defense or indemnification in the underlying lawsuit.

(*Id.* at 3-4).

On October 8, 2012, Lexington filed this action. On March 5, 2013, the court in the Underlying Lawsuit entered the Stipulated Judgment pursuant to the Settlement Agreement. (Doc. 289-5 at 4).

### b.   Legal Standard

The Arizona Supreme Court has recognized exceptions to an insured's contractual obligation to cooperate with its insurer when the "insurer has breached its duty to defend or to indemnify." *United Servs. Auto Ass'n v. Morris*, 741 P.2d 246, 254 (Ariz. 1987) (Holohan, J., dissenting). The seminal case in this area is *Damron v. Sledge*, 460 P.2d 997 (1969), in which the Arizona Supreme Court held that when an insurer refuses to defend and denies coverage, the insured may enter into a settlement agreement with the plaintiff "in which an insured defendant admits to liability and assigns to a plaintiff his or her rights against the liability insurer, including any cause of action for bad faith, in exchange for a promise by the plaintiff not to execute the judgment against the insured." *Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1022 ¶ 1 n.1 (2005). When such a settlement agreement is entered into as a result of the insurer's refusal to defend the insured, it is generally referred to as a *Damron* agreement. *See id.*

Similar to *Damron* agreements are *Morris* agreements, which apply when an insurer defends its insured but only under a reservation of rights. In *Morris*, the Arizona Supreme Court extended the applicability of *Damron* agreements, holding that the

cooperation clause in an insurance contract prohibiting "settling without the insurer's consent forbids an insured from settling only claims for which the insurer unconditionally assumes liability under the policy." *Morris*, 741 P.2d at 252. "Thus, an insured being defended under a reservation of rights may enter into a *Damron* agreement without breaching the cooperation clause. "Such agreements must be made fairly, with notice to the insurer, and without fraud or collusion on the insurer." *Id.*

Finally, *Damron* (and *Morris*) agreements "are not inherently collusive or fraudulent." *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme*, 735 P.2d 451, 460 (Ariz. 1987).

### c.    Analysis

Lexington argues neither *Damron* nor *Morris* excuses Scott Homes from its obligation under the Lexington Excess Policy to cooperate with Lexington and Scott Homes failed to cooperate when it entered into the Settlement Agreement. (Doc. 281 at 6). Silverbell contends Lexington breached its duty to defend Scott Homes. (Doc. 287 at 14).

The parties do not dispute that under Arizona law, "[u]ntil a primary insurer offers its policy limit, the excess insurer does not have a duty to evaluate a settlement offer, to participate in the defense, or to act at all." *Twin City Fire Ins. Co. v. Burke*, 63 P.3d 282, 287 ¶ 18 (2003). Rather, they disagree as to when, if ever, Lexington's duty to defend in the Underlying Lawsuit arose. Lexington contends its duty to defend arose only after Evanston paid its policy limits, and because this payment occurred on the same date as the execution of the Settlement Agreement, Lexington had no duty to defend prior to the execution of the Settlement Agreement. Lexington thus contends *Damron* is inapplicable and the Settlement Agreement is a breach of Scott Homes' contractual obligation to cooperate with Lexington. Silverbell argues that Lexington had an opportunity to defend Scott Homes because the Settlement Agreement provided Lexington a notice period prior to the assignment of Scott Homes' rights against Lexington and the entry of the Stipulated Judgment during which Lexington could elect to defend. (Doc. 287 at 14-15).

Lexington's argument fails because it conflates the execution of the Settlement Agreement with the operative acts necessary for an insured to breach its cooperation obligation with its insurer, namely the assignment of rights and the entry of a stipulated judgment. Assuming without deciding, in the light most favorable to Lexington, that Lexington's duty to defend was triggered not upon Evanston offering its policy limits but only upon Evanston actually paying its policy limits, Lexington's duty to defend arose at the latest upon the execution of the Settlement Agreement when Evanston paid its policy limits.

The Settlement Agreement, however, gave Lexington a notice period (until October 1, 2012, and later extended to October 9, 2012) during which neither an assignment of rights nor the entry of a stipulated judgment would occur. The Settlement Agreement explicitly conditioned the assignment of Scott Homes' rights and the entry of judgment against Scott Homes upon Lexington's failure to assume the defense of Scott Homes following the expiration of this notice period. *See* (Doc. 270-4 at 4-5). Thus, during this notice period, Lexington could elect to defend Scott Homes, which would preclude any assignment and stipulated judgment; if Lexington chose to defend Scott Homes, Silverbell's case against Scott Homes (and subcontractors) would have proceeded to trial.

In *Damron*, the issue presented for the Arizona Supreme Court was "the validity of the prejudgment assignment," not the validity of entering into an agreement for an subsequent assignment conditioned on the insurer's refusal to defend. *See Damron*, 460 P.2d at 999. The acts that, but for *Damron*, would constitute a breach of the insured's obligation to cooperate are the assignment of the insured's rights against the insurer and the entry of the stipulated judgment—not the execution of a settlement agreement.

During the notice period subsequent to the execution of the Settlement Agreement, Lexington had the duty to defend Scott Homes. Lexington also had notice of the Settlement Agreement and the *Damron* implications if it refused to defend. Thus, *Damron* applies. Nevertheless, Lexington argues that even during the notice period it had

no duty to defend Scott Homes because the Settlement Agreement required it to unconditionally defend Scott Homes and under Arizona law, an insured cannot condition an insurer's right to defend upon the insurer's waiver of its policy defenses. *See* (Doc. 296 at 6). Lexington is correct that an "insured may not condition the insurer's right to defend upon an agreement by the insurer to waive its right to later litigate the question of coverage." *McGough v. Ins. Co. of N. Am.*, 691 P.2d 738, 745 (Ariz. Ct. App. 1984). But *McGough* involved very different facts than those in the present case.

In *McGough*, the excess insurer, upon learning the primary insurer was "considering paying its policy limits . . . and withdrawing from the defense of the suit," wrote to the parties and stated it would assume the defense of the defendant "if and when" the primary insurer determined it no longer had such an obligation, including retaining the same attorney to "maintain a continuity" of the defense. *Id.* at 741. The defendants refused to allow the excess insurer to provide a defense unless the insurer dismissed a pending declaratory judgment action and acknowledged coverage, and simultaneously entered into a purported *Damron* agreement with the plaintiffs. *Id.* But here, Lexington never even offered to defend Scott Homes, either unconditionally or under a reservation of rights. To the contrary, Scott Homes repeatedly tendered its defense to Lexington and Lexington repeatedly refused to defend. Most significantly, Lexington asserted in its October 5, 2012 letter—written during the Settlement Agreement's notice period and before any assignment of Scott Homes' rights—that it had no duty to defend because the underlying insurance to the Lexington Excess Policy had not exhausted.

Lexington attempts to spin a hypothetical into reality by asserting that the conditions placed on it in the Settlement Agreement violated Arizona law and thus precluded Lexington from having an opportunity to defend. (Doc. 296 at 6). Hypothetically, had Lexington agreed to defend Scott Homes under a reservation of rights and Scott Homes still subsequently assigned its rights to Silverbell and entered into the Stipulated Judgment, Lexington's argument could have merit and on those facts the

Court would then have to determine whether *Morris* applied; if *Morris* did not apply, then *McGough* would protect Lexington. But the fact that the Settlement Agreement demanded that Lexington unconditionally defend Scott Homes did not prevent Lexington from defending under a reservation of rights. At the time of the Settlement Agreement's execution, Lexington had a duty to defend Scott Homes. Lexington declined to defend Scott Homes, either unconditionally or under a reservation of rights. After Lexington had notice and an opportunity to defend Scott Homes, Scott Homes assigned its rights to Silverbell and entered into the Stipulated Judgment. Lexington, who throughout this litigation has brandished the terms of the Lexington Excess Policy, surely does not argue that a term in the Settlement Agreement, to which Lexington was not a party, supersedes its obligation to defend pursuant to the terms of the Lexington Excess Policy. Lexington's argument that the Settlement Agreement prevented it from exercising its right to defend under a reservation of rights is not credible.

Lexington additionally argues it had no duty to defend Scott Homes because the Settlement Agreement released the claims that could have triggered coverage under the Lexington Excess Policy, and therefore there was nothing against which to defend Scott Homes. (Doc. 281 at 9). Lexington's factual understanding is in error. The Settlement Agreement did not release any claims against Scott Homes. The Settlement Agreement provides for Silverbell to covenant not to execute the Stipulated Judgment against Scott Homes. *See* (Doc. 270-4 at 6). Lexington's argument fails.

Because the Settlement Agreement was a valid *Damron* agreement, Scott Homes did not breach the cooperation clause (nor the related clauses, such as the anti-assignment clause) of the Lexington Excess Policy.[5]

### 2. Property Damage Caused by an Occurrence

Lexington also argues Silverbell cannot establish coverage under the Lexington Excess Policy because Silverbell cannot show more than $1 million of covered property

---

[5] Therefore, the Court need not address Lexington's argument that the Settlement Agreement could not be a valid *Morris* agreement because Lexington never defended under a reservation of rights. *See* (Doc. 281 at 8-9).

damage caused by an occurrence within the definitions of the Lexington Excess Policy. (Doc. 281 at 10). Silverbell argues that Lexington, as an insurer who failed to defend its insured, is not entitled to relitigate the issues of liability and damages and Lexington is obligated to pay the $6 million amount of the Stipulated Judgment to Silverbell. (Doc. 287 at 17).

### a. Whether Coverage is at Issue

The Arizona Supreme Court has recently squarely addressed this issue:

> In sum, consistent with our prior cases, we hold that when an injured party obtains a default judgment against an insured pursuant to a *Damron* or *Morris* agreement, that judgment will bind the insurer in a coverage case as to the existence and extent of the insured's liability. With the limitation recognized in *Morris* and *Wood*, however, the judgment will not preclude the insurer from litigating its identified basis for contesting coverage, irrespective of any fault or damages assessed against the insured.

*Quihuis v. State Farm Mut. Auto. Ins. Co.*, 334 P.3d 719, 729-30 ¶ 38 (Ariz. 2014).

The court's reference to a "limitation recognized in *Morris* and *Wood*" refers to the court's statement earlier in its opinion that "we have adopted Restatement [(Second) of Judgments] § 58 with the limitation recognized in *Morris*—insurers generally are not precluded from litigating coverage issues." *Id.* at 724-25 ¶ 15. In *Morris*, the court concluded that although the insurer could not litigate the fact or amount of liability, it could litigate whether there was coverage under the policy because insureds cannot "'obtain coverage that the insured did not purchase' simply by entering into a *Damron* or *Morris* agreement." *Id.* at 724 ¶ 12 (quoting *Morris*, 741 P.2d at 253). In *Wood*, the Arizona Court of Appeals held that "issues subsumed in a *Morris* agreement and relating strictly to liability and damages rather than coverage 'must be given the same binding, collateral estoppel effect as if the judgment in the underlying tort action had been entered after a fully litigated trial—subject only to a judicial determination that the settlement is reasonable and non-collusive.'" *Assoc. Aviation Underwriters v. Wood*, 98 P.3d 572, 587 ¶ 47 (Ariz. Ct. App. 2004); *see also Quihuis*, 334 P.3d at 724 ¶ 14 (discussing *Wood*).

The condition of *Wood* that the settlement must be reasonable and non-collusive is

the appropriate subject of inquiry after a court has determined that coverage exists. As the Arizona Supreme Court noted in *Quihuis*, "when an insurer refuses to defend . . . it does so 'at its peril,' and if a court later finds coverage, the insurer must pay the damages awarded in the default judgment (at least up to the policy limits) unless it can prove fraud or collusion." *Quihuis*, 334 P.3d at 730 ¶ 39 (citation omitted) (quoting *Parking Concepts, Inc. v. Tenney*, 83 P.3d 19, 22 ¶ 15 n.3 (Ariz. 2004)). In *Parking Concepts*, the court noted that "in cases where the insurer has refused to defend and the parties enter into a *Damron* agreement, the insurer has no right to contest the stipulated damages on the basis of reasonableness, but rather may contest the settlement only for fraud or collusion." 83 P.3d at 22 ¶ 15 n.3. Thus, when a *Damron* agreement is at issue and a court finds coverage under the policy, the insurer's sole defense is that the settlement agreement was the product of fraud or collusion.

Although the present case does not involve a *Morris* agreement, because a complete overview of the *Damron/Morris* law aids in understanding the issues, the Court notes (even if academically) that the inquiry following a finding of coverage differs slightly when a *Morris*, rather than *Damron*, agreement is involved. In such cases, "neither the fact nor amount of liability to the claimant is binding on the insurer unless the insured or claimant can show that the settlement was reasonable and prudent." *Id.* at 22 ¶ 15. This is because, as the court recognized in *Morris*, "an insured being defended under a reservation might settle for an inflated amount or capitulate to a frivolous case merely to escape exposure or further annoyance." *Morris*, 741 P.2d at 253. "The test as to whether the settlement was reasonable and prudent is what a reasonably prudent person in the insureds' position would have settled for on the *merits* of the claimant's case." *Id.* at 254. The court in *Morris* thus concluded:

> . . . [The insurer] is free to litigate the facts of the coverage defense. If the insurer wins on the coverage issue, it is not liable for any part of the settlement. If it loses, it may or may not be bound by the amount of the judgment . . . . [The plaintiff] will have the burden of showing that the judgment was not fraudulent or collusive and was fair and reasonable under the circumstances. If [the plaintiff] cannot show that the entire amount of the stipulated judgment was reasonable,

he may recover only the portion that he proves was reasonable. If he is unable to prove the reasonableness of any portion of the judgment, [the insurer] will not be bound by the settlement.

*Id.* (citation omitted).

The present case involves a *Damron* agreement. Accordingly, under *Quihuis*, Lexington is bound to the existence and extent of Scott Homes' liability. However, Lexington may litigate coverage under the Lexington Excess Policy. If Silverbell proves coverage, Lexington will be liable to Silverbell for the Stipulated Judgment unless Lexington proves that the Settlement Agreement was the product of fraud or collusion.

### b.    Coverage

Lexington asserts Silverbell cannot prove covered property damages in excess of $1 million, the amount needed to trigger coverage under the Lexington Excess Policy. Specifically, Lexington alleges Silverbell's damages experts improperly include costs of repairing defective construction in concluding covered property damages exceed $1 million. (*Id.* at 10-11).

The Lexington Excess Policy incorporates the Evanston Policy's definitions of "occurrence" and "property damage." *See* (Doc. 270-1 at 4). The Evanston Policy provides coverage for only "'property damage' [that] is caused by an 'occurrence' that takes place in the 'coverage territory'" and "occurs during the policy period." (Doc. 270-2 at 42). The Evanston Policy defines "property damage" as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(*Id.* at 53). The Evanston Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[6]

---

[6] Although the Lexington Excess Policy contains a slightly different definition of

(*Id.*)

Lexington argues that faulty workmanship (i.e. defective construction) does not constitute an "occurrence" within the definition of the Lexington Excess Policy. (Doc. 281 at 10). Specifically, Lexington argues:

> Arizona courts have construed similar insuring language and held that faulty workmanship does not constitute an "occurrence" within the meaning of standard insurance policies, and the cost to repair faulty work does not constitute "property damage." *United States Fid. & Guar. Corp. v. Advance Roofing and Supply Corp.*, 163 Ariz. 476, 482, 788 P.2d 1227, 1233 (App. 1989); *Lennar Corp. v. Auto-Owners Ins. Co.*, 214 Ariz. 244, 262, 151 P.3d 538, 546 (App. 2007).

(Doc. 281 at 10). There are two problems here. First, Lexington's phrasing implies an unnatural narrowing of the issue in the present case. Silverbell does not claim Scott Homes suffered damages for faulty workmanship. Rather, Silverbell claims Scott Homes suffered damages for property damage *resulting from* faulty workmanship. Second, *United States Fidelity & Guaranty Corporation* reinforces the distinction between faulty workmanship and property damages caused by faulty workmanship; that case holds that "mere faulty workmanship, *standing alone*, cannot constitute an occurrence." 788 P.2d at 482 (emphasis added). As the Court has stated, this case does not involve "mere faulty workmanship." As the Arizona Court of Appeals held in *Lennar*, faulty work that results in property damage is an occurrence, even if the damage is "a natural consequence of faulty construction." 151 P.3d at 545 ¶ 20, 546 ¶ 24.

Thus, on this point, Silverbell survives Lexington's motion for summary judgment if Silverbell shows a genuine issue of material fact as to whether Scott Homes suffered damages exceeding $1 million for property damage caused by construction defects. Silverbell offers the deposition testimony of its expert witness Richard Avelar, who opines that Scott Homes suffered property and resultant damages to tangible property of $7.6 million in addition to loss of use damages of $1.7 million. (Doc. 289-19 at 42, 44).

---

"occurrence," (Doc. 270-1 at 7), the Arizona Court of Appeals has held that these definitions are substantially identical. *See Lennar Corp. v. Auto-Owners Ins. Co.*, 151 P.3d 538, 544 ¶ 15 n.9 (Ariz. Ct. App. 2007).

Lexington argues that Avelar fails to distinguish between non-covered costs to repair faulty workmanship and covered resultant property damage.[7] (Doc. 281 at 11). Avelar admits that his $7.6 million figure does not distinguish between property damages and resultant damages, (Doc. 289-19 at 44), and it is not entirely clear how Avelar's understanding of "property damage" and "resultant damage" meshes with the Lexington Excess Policy's definition of "physical injury to tangible property," (*id.* at 39-40). Additionally, Lexington's expert testifies that Scott Homes suffered less than $1 million in covered property damage. (Doc. 289 ¶ 90). But in ruling on a motion for summary judgment the Court must construe the facts and all reasonable inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. Avelar's testimony that Scott Homes suffered $7.6 million in property and resultant damages as well as $1.7 million in loss of use damages reasonably supports the inference that Scott Homes suffered more than $1 million in damages for "physical injury to tangible property," as the Lexington Excess Policy requires. A genuine issue of material fact exists on this point, and Lexington is not entitled to summary judgment on the issue of coverage under the Lexington Excess Policy.[8]

### 3.    Bad Faith

Lexington next argues it is entitled to summary judgment on Silverbell's counterclaim for bad faith. (Doc. 281 at 13).

---

[7] Lexington also argues that commercial general liability policies do not cover "get to costs," or the cost of repairing undamaged property that must be destroyed to access and repair the damaged property. (Doc. 281 at 10). Lexington implies that Avelar failed to exclude these costs from his analysis. But Avelar testified that his figure of $9.3 million does not include "get to costs." (Doc. 289-19 at 43). Lexington's statement of the law is correct but inapplicable here.

[8] Lexington contends in its motion that because the Evanston Policy and the Lexington Excess Policy provide coverage only for occurrences that take place during the policy period, it is entitled to summary judgment "with respect to that portion of the stipulated judgment that represents property damage that did not occur during the Lexington Excess Policy period." (Doc. 281 at 13). Lexington offers no facts or analysis in support of this bare contention. Lexington does not discuss the dates of the policy period nor when the damage to the Apartments is alleged to have taken place. Without any such facts, Lexington's argument fails.

### a.     Legal Standard

"The tort of bad faith arises when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis.'" *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279-80 ¶ 20 (Ariz. 2000) (quoting *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981)). An insured alleging a bad faith claim against his insurer must show that "in the investigation, evaluation, and processing of the claim," the insurer acted unreasonably and either knew or recklessly disregarded the fact that its conduct was unreasonable. *Id.* at 280 ¶ 22; *Noble*, 624 P.2d at 868. "The first prong of the test for bad faith is an objective test based on reasonableness. The second prong is a subjective test, requiring the plaintiff to show that the defendant insurance company committed consciously unreasonable conduct." *Milhone v. Allstate Ins. Co.*, 289 F. Supp. 2d 1089, 1094 (D. Ariz. 2003) (citing *Trus Joist Corp. v. Safeco Ins. Co.*, 735 P.2d 125, 134 (Ariz. Ct. App. 1986)).

In *Zilisch*, the Arizona Supreme Court clarified that considerations such as whether the claim was fairly debatable are not the beginning and the end of the bad faith analysis. *Zilisch*, 995 P.2d at 280 ¶ 21. "[W]hile fair debatability is a necessary condition to avoid a claim of bad faith, it is not always a sufficient condition." *Id.* at 280 ¶ 22. Nor does the fact that an insurer ultimately pays a claim preclude a finding of bad faith, if the insurer acted unreasonably in its processing of the claim. *Id.* at 279-80 ¶ 20 ("[I]f an insurer acts unreasonably in the manner in which it processes a claim, it will be held liable for bad faith 'without regard to its ultimate merits.'" (citation omitted)).

### b.     Analysis

Lexington first argues that because it never had a duty to defend, it had no duty to investigate, evaluate or process Scott Homes' claim, and therefore it could not have committed bad faith. (Doc. 281 at 14). This argument fails because, for the reasons previously stated, Lexington had a duty to defend Scott Homes upon the execution of the Settlement Agreement.

Next, Lexington argues that it never denied coverage to Scott Homes and therefore

acted reasonably in investigating, evaluating, and processing Scott Homes' claim. (*Id.* at 15). But an insurer's refusal to defend its insured can give rise to a bad faith claim. *See Quihuis*, 334 P.3d at 730 ¶ 40. Therefore, even if it were true that Lexington never denied coverage, Silverbell can still prove bad faith if it shows Lexington's refusal to defend was unreasonable.

Finally, Lexington argues that at the time of the events in the Underlying Lawsuit, its interpretation of the Lexington Excess Policy as being excess to both the Evanston Policy and to the subcontractors' policies was reasonable and fairly debatable. (*Id.* at 15-16). Because Lexington's October 5, 2012 refusal to defend Scott Homes was founded upon Lexington's belief that not all underlying insurance to the Lexington Excess Policy had exhausted, Lexington essentially argues that as a matter of law it did not commit bad faith by refusing to defend Scott Homes.

Silverbell contends the opposite; specifically, that there can be no question as to the unreasonableness of Lexington's interpretation of the Lexington Excess Policy because the Court's ruling on Lexington's first motion for summary judgment declared that Lexington's interpretation was unreasonable and contradicted the Lexington Excess Policy's plain language. (Doc. 287 at 20); *see also* (Doc. 273 at 17). However, the Court's prior ruling necessarily commented only upon the arguments that Lexington advanced in its motion for summary judgment and its reply in support of its motion. Lexington's arguments in those two filings advocated an interpretation of the Lexington Excess Policy that was unreasonable because it would contradict the policy's plain language. *See* (Doc. 159 at 12). But Silverbell offers no authority for the proposition that Lexington's position in the present lawsuit can support, post-hoc, Silverbell's bad faith counterclaim.

Although Silverbell is correct that an insurer has a continuing duty of good faith during litigation, (Doc. 287 at 12), its reliance upon *Lennar Corp. v. Transamerica Insurance Co.*, 256 P.3d 635 (Ariz. Ct. App. 2011) is misplaced because that case holds only that an insurer "that objects to coverage may not for that reason disregard its claims-

handling responsibilities pending resolution of the coverage issue." 256 P.3d at 245 ¶ 24. Thus, *Lennar* stands for the common-sense proposition that the insurer must continue to handle the insured's claim in good faith even if coverage litigation has commenced; it does not speak on the topic of conduct in coverage litigation.

Furthermore, *Tucson Airport Authority v. Certain Underwriters at Lloyds, London*, 918 P.2d 1063 (Ariz. Ct. App. 1996) holds that the litigation privilege does not bar the admissibility of an insurer's course of conduct during coverage litigation when the course of conduct is merely evidence of "a course of wrongful and tortious conduct." 918 P.2d at 1066 (emphasis added). There are two critical limitations in the holding of *Tucson Airport Authority*. First, there the coverage litigation and the bad faith litigation were separate cases, and so *Tucson Airport Authority* does *not* hold that an insurer's course of conduct in particular litigation can support a bad faith claim made in the same litigation. *See id.* Second, the Arizona Court of Appeals explicitly distinguished between a bad faith claim "based squarely on a privileged communication, such as an action for defamation, and one based upon an underlying course of conduct evidenced by the communication." *Id.* The court restricted its holding to bad faith claims using the "insurers' actions and communications during the coverage actions" as evidence showing a course of wrongful conduct constituting bad faith, and noted that the litigation privilege would bar bad faith claims arising out of a particular communication or pleading in a coverage action. *Id.*

Consequently, Silverbell has not identified any controlling authorities that permit Lexington's communications or filings in the present case to be used as evidentiary support for Silverbell's bad faith claims. In the absence of such authorities, the Court at this time declines Silverbell's invitation to treat the Court's ruling on Lexington's first motion for summary judgment as determinative of Lexington's bad faith.

Returning to Lexington's arguments, Lexington contends that at the time it declined to defend Scott Homes, it was fairly debatable whether the definition of "Underlying Insurance" in the Lexington Excess Policy included the subcontractors'

insurance policies because no case law had interpreted the provisions of the Lexington Excess Policy.[9] (Doc. 281 at 16-17). Ordinarily, an insurer's "belief in fair debatability is a question of fact to be determined by the jury." *Zilisch*, 995 P.2d at 279-80 ¶ 20 (citation and internal quotation marks omitted). Although the existence of case law interpreting the definition of "Underlying Insurance" in the Lexington Excess Policy would tend to make the question of the definition of "Underlying Insurance" not fairly debatable, the inverse is not necessarily true. For example, an insurer can interpret its policy in a manner contrary to the policy's plain language; even in the absence of controlling case law, a reasonable jury could find this to be both unreasonable and consciously known by the insurer to be unreasonable, thus establishing bad faith.

Silverbell survives summary judgment on its bad faith claim because it has demonstrated a genuine issue of material fact. Silverbell offers the deposition testimony of Jodi Mintz, Lexington's assistant vice-president responsible for supervising the claims handling of the Silverbell and Scott Homes matter. (Doc. 289-22 at 4, 8). Mintz testifies that she has read the Court's ruling on Lexington's first motion for summary judgment but Lexington "respectfully disagree[s]" and has not reconsidered its position. (*Id.* at 36-37). Mintz's testimony could reasonably support a finding of bad faith against Lexington. *See Lennar*, 256 P.3d at 245 ¶ 24 (insurer has a continuing duty of good faith in handling claims after the initiation of coverage litigation).

Accordingly, Lexington has not shown it is entitled to summary judgment on Silverbell's bad faith claim. Rather, there exists an issue of fact for the jury as to whether in the investigation, evaluation, and processing of Scott Homes' claim, Lexington acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable.

---

[9] Lexington also argues that under *Tobel v. Travelers Insurance Co.*, 988 P.2d 148 (Ariz. Ct. App. 1999) there can be no bad faith claim if the insurance claim was "fairly debatable." (Doc. 296 at 10). Although the Arizona Court of Appeals so held in *Tobel*, 988 P.2d at 156 ¶ 45, the Arizona Supreme Court held to the contrary one year later in *Zilisch*. 995 P.2d at 280 ¶¶ 21-22 ("But, as we have held, while fair debatability is a necessary condition to avoid a claim of bad faith, it is not always a sufficient condition.").

### 4.     Punitive Damages

Lexington contends it is entitled to summary judgment on Silverbell's counterclaim against Lexington for punitive damages because there is no evidence that Lexington acted with evil motives in handling Scott Homes' claim. (Doc. 281 at 18).

Although an award of punitive damages is available in claims for insurance bad faith, it is available only in "those cases in which the defendant's wrongful conduct was guided by evil motives." *Rawlings*, 726 P.2d at 578. The insured must prove that the insurer's "evil hand was guided by an evil mind," which may exist when the insurer intended to injure the insured or when the insurer "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Id.* The insurer's conduct must have been "aggravated, outrageous, malicious or fraudulent." *Id.* "Indifference to facts or failure to investigate are sufficient to establish the tort of bad faith but may not raise to the level required by the punitive damage rule." *Id.*

Silverbell fails to show the existence of a genuine issue of material fact as to whether Lexington's wrongful conduct was guided by evil motives. Silverbell states that it "has proffered facts that evidence Lexington's evil hand unjustifiably damaged the objectives sought to be reached by the insurance contract and that Lexington's actions were, and continue to be, guided by an evil mind." (Doc. 287 at 21). But Silverbell does not identify these facts, and in the Court's review of Silverbell's entire response to Lexington's motion for summary judgment, there are no references to facts supporting an award of punitive damages. Accordingly, Lexington is entitled to summary judgment on the issue of punitive damages.

### C.     Silverbell's Motion for Summary Judgment

Silverbell moves for summary judgment in its favor on counts I, II, XI, and XVI of Lexington's First Amended Complaint as well as summary judgment on Silverbell's counterclaim for bad faith. (Doc. 273). Silverbell also asks the Court to declare that certain facts in this case are undisputed. (*Id.*)

### 1.     Exhaustion of the Lexington Excess Policy

Silverbell requests summary judgment on Count I of Lexington's First Amended Complaint, in which Lexington seeks a declaration that the Lexington Excess Policy is not currently implicated and Lexington owes no duty to defend Scott Homes. (Doc. 273 at 7; Doc. 270 at 19). In the Court's prior ruling on Lexington's first motion for summary judgment, the Court concluded that the Evanston Policy is the only underlying policy to the Lexington Excess Policy, and the Lexington Excess Policy is therefore excess to only the Evanston Policy. (Doc. 159 at 12). The Court incorporates by reference its reasoning from that ruling and reaffirms this conclusion.

### a.       Definition of "Loss"

Lexington admits that the Lexington Excess Policy is excess to the Evanston Policy but argues the Lexington Excess Policy does not pay losses after only the Evanston Policy is exhausted. (Doc. 291 at 5). Lexington contends that the exhaustion of the Evanston Policy is not sufficient to trigger Lexington's obligation to pay "loss" under the Lexington Excess Policy. (Doc. 291 at 5).

The coverage section of the Lexington Excess Policy provides, in relevant part:

> We will pay on behalf of the **Insured** that portion of the **loss** which the **Insured** will become legally obligated to pay as compensatory damages (excluding all fines, penalties, punitive or exemplary damages) by reason of exhaustion of all applicable underlying limits, whether collectible or not, as specified in Section II of the Declarations . . . .

(Doc. 270-1 at 4). The Lexington Excess Policy defines "**loss**" as:

> The word **loss** means the sum paid in settlement of losses for which the **Insured** is liable after making deductions for all recoveries, salvages and other insurance (other than recoveries under the policy of the **underlying insurance**), whether recoverable or not, and shall include all expenses and costs.

(*Id.* at 7).

Lexington contends that this definition of "loss" defines the scope of Lexington's coverage because it is incorporated into the coverage section of the Lexington Excess Policy and Silverbell has not demonstrated Lexington would have an obligation to pay

"loss" after deducting Silverbell's other recoveries and other insurance. (Doc. 291 at 6). Silverbell contends that this definition does not affect coverage but rather applies only to sums paid in settlement between the insured and the insurer. (Doc. 295 at 3). The interpretation of an insurance policy is a question of law, and a court must construe the policy to "effectuate the parties' intent." *Liberty Ins. Underwriters, Inc. v. Weitz Co.*, 158 P.3d 209, 212 ¶¶ 7-8 (Ariz. Ct. App. 2007).

The Lexington Excess Policy's plain language provides for coverage when Scott Homes becomes legally obligated to pay a portion of a loss as compensatory damages by reason of the exhaustion of the Evanston Policy. This loss is then limited to the "sum paid in settlement of losses for which [Lexington] is liable after making deductions for all recoveries, salvages, and other insurance . . . . (Doc. 270-1 at 7). According to this plain language, this limitation appropriately adjusts downward the scope of the insurer's coverage obligation as an excess insurer if the insured is able to recover some of its losses from another source. Lexington is obligated to pay for covered losses to its insured upon the exhaustion of the underlying policy, but Lexington is never obligated to pay for covered losses that have already been paid by another source.

Silverbell contends the definition of "loss" in the Lexington Excess Policy does not bear upon coverage but merely provides an accounting for payments between the insurer and insured when a settlement is paid. (Doc. 295 at 3). But the Lexington Excess Policy uses the defined term "loss" in describing the obligations of an insured to third parties to pay compensatory damages. In context, it states: ". . . that portion of the **loss** which the **Insured** will become legally obligated to pay as compensatory damages . . . ." (Doc. 270-1 at 4). It is clear from this use of the term that "loss" refers to losses as between the insured and third parties, not a settlement of payments between the insured and the insurer.

Accordingly, the definition of "loss" in the Lexington Excess Policy affects the scope of coverage. The Lexington Excess Policy covers "physical injury to tangible property" (as well as loss of use of tangible property) in excess of $1 million. If Silverbell

otherwise proves coverage under the Lexington Excess Policy, to collect the full $5 million against Lexington, Silverbell must show that it did not receive payments from other sources for those sources' liability under the Stipulated Judgment (other than the payment from Evanston, which reduces the $6 million amount of the Stipulated Judgment to $5 million).[10]

### b.    Course of Dealing

In addition to Lexington's argument concerning "loss," Lexington also argues that Lexington and Scott Homes' course of dealing shows that the parties did not intend the Lexington Excess Policy to be excess to only the Evanston Policy, and therefore the Lexington Excess Policy is not exhausted simply because the Evanston Policy is exhausted. (Doc. 291 at 6). Course of dealing evidence is extrinsic evidence, *AROK Constr. Co. v. Ind. Constr. Servs.*, 848 P.2d 870, 877 (Ariz. Ct. App. 1993), which may be admitted "to determine the meaning intended by the parties" if the court finds "that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent," *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1138, 1140 (Ariz. 1993).

Lexington argues the parties intended, as evidenced by their contractual arrangements for the prior year 2001-02, to have the Lexington Excess Policy sit as excess to policies more than one layer "down" in coverage. (Doc. 291 at 6-7). Lexington points out that for 2001-02, Lexington issued an excess policy that was excess to an umbrella policy that in turn was excess to an Evanston policy. (*Id.*) Thus, Lexington contends, because Scott Homes agreed in a separate lawsuit concerning 2001-02 that the 2001-02 Evanston-issued policy had to exhaust before Lexington's 2001-02 excess policy was implicated, the parties intended in general for Lexington's excess policies to sit as

---

[10] For example, if Silverbell received a payment from one of Scott Homes' subcontractor's insurers that covered all but $500,000 of Scott Homes' total liability to Silverbell, then the Lexington Excess Policy does not provide coverage. Similarly, if Silverbell received a payment from one of Scott Homes' subcontractor's insurers for $1 million, and no other payments, Lexington's liability would be $4 million.

Practically speaking, if Silverbell offers competent testimony that no such payments exist, Lexington will need to show affirmative evidence of their existence.

excess to several layers of policies. (*Id.* at 7). Lexington's argument insinuates that the Court's interpretation of the Lexington Excess Policy as sitting as excess to only the Evanston Policy somehow destroys the relationships among the various layers of insurance protecting Scott Homes. This is not the case.

The relationship between the Evanston Policy and the subcontractors' policies, to which the Evanston Policy purports to be excess, (Doc. 270-2 at 50), is not destroyed merely because the Lexington Excess Policy is excess only to the Evanston Policy. Evanston, as a commercial insurer, is not in the business of donating money to its insureds. Thus, one expects Evanston to pay its policy limits only upon Evanston's commercially reasonable belief that any policies to which the Evanston Policy sits as excess are either exhausted or are uncollectible. If Evanston determines that the Evanston Policy has exhausted in the payment of covered claims, then presumably all insurance layers below the Lexington Excess Policy are exhausted. There is no prejudice to Lexington in such a scenario.

Lexington further attempts to impart misleading inferences by pointing to its underwriting process in which it inquired as to the limits of liability that Scott Homes required its subcontractors to carry and whether Scott Homes required its subcontractors to name Scott Homes as an additional insured on their policies. (Doc. 291 at 7-8). Lexington poses the question: "If the parties expected and intended for the Lexington Excess Policy to provide coverage only in excess of the Evanston Policy, . . . then there would have been no need to ask these questions." (*Id.* at 8). Lexington further alleges that the Court's conclusions have compelled Lexington to provide coverage for a risk that it never intended to insure. (*Id.*)

But Lexington's underwriting investigation actually supports the Court's interpretation. An insurance policy can be appropriately priced only when the insurer accurately estimates the risk to the insured. Lexington's risk as an excess insurer depends upon the probability of the Evanston Policy exhausting. The probability of the Evanston Policy exhausting depends upon whether Scott Homes is able to collect on any policies of

its subcontractors, because the Evanston Policy is excess to those policies. Thus, Lexington's inquiry appears designed to accurately calculate the proper premium for the Lexington Excess Policy as excess to only the Evanston Policy.

Moreover, Lexington had to have known from the start of its underwriting process that because the Lexington Excess Policy is excess to only the Evanston Policy, Evanston had the sole power to determine whether the subcontractors' policies were collectible and whether to pay the limits on the Evanston Policy. This was a known risk, and Lexington accepted this risk because Evanston presumably does not pay its policy limits when other collectible insurance is available.

### c.     Evanston's Coverage Decision

Lexington additionally argues the Evanston Policy is not exhausted in the payment of covered claims because Evanston's payment of its policy limits and the declaration of Evanston's claims examiner are insufficient evidence to establish that Evanston paid for covered property damage. (*Id.* at 9). Lexington raised, and the Court rejected, this same ill-founded argument in its first motion for summary judgment. The Court stated:

> Although Lexington is bound by the terms of the Evanston Policy because the Lexington Excess Policy incorporates those terms, Lexington is not bound by Evanston's coverage decision. *See Shy v. Ins. Co. of the State of Penn.*, 528 F. App'x 752, 754 (9th Cir. 2013). But similarly, Lexington may not attempt to relitigate Evanston's coverage decision. *See Edward E. Gillen Co. v. Ins. Co. of the State of Penn.*, 2011 WL 1694431, at *4 (E.D. Wis. May 3, 2011) . . . . The Evanston Policy has exhausted by Evanston's payment of covered claims.

(Doc. 159 at 14). Lexington selectively cites the Court's ruling for the proposition that an excess insurer is not bound by the primary insurer's coverage decision. (Doc. 291 at 9). Lexington ignores, however, the corresponding proposition that the excess insurer may not relitigate the primary insurer's coverage decision. For the reasons the Court expressed in its prior ruling, the Court reaffirms that the Evanston Policy has exhausted by Evanston's payment of its $1 million policy limit for covered claims.

### d.    The Evanston Policy's "Cross-Suits" Exclusion

Lexington next contends the Evanston Policy contains a "cross-suits" exclusion to coverage that applies in this case. (*Id.*) Because the Lexington Excess Policy follows form to the Evanston Policy, any applicable exclusion could preclude coverage under the Lexington Excess Policy even though the Evanston Policy is exhausted. The Evanston Policy provides:

> It is agreed that this Insurance does not apply to any liability of one insured for "bodily injury" or "property damage" to the property or person of another insured.

(Doc. 270-2 at 45). Schedule A of the Evanston Policy lists the named insureds under the policy. This list spans three pages; the tops of the second and third pages have a heading identifying them as continuations of the named insured list. (*Id.* at 8-10). The page following the end of the named insured list has no heading and reads:

> Any subsidiaries, Affiliated, Controlled or Associated Companies, Trust, Association or Partnership as now or may hereafter exist; for the account of whom it may concern, the interest of the insured in any partnership or joint venture, if not otherwise insured; any and partnership or joint venture interests of which the Insured is a participant to the extent the Insured is required to insure such interests, as the respective interest may appear.

(*Id.* at 11).

Lexington urges that Silverbell is a named insured under the Evanston Policy because Timberline Village Corp. (a general partner of Silverbell) and three Robson family members are named insureds "'affiliated' with and 'controlled' by" Silverbell. (Doc. 291 at 11). This argument is frivolous. The fact that Scott Homes and Silverbell have some shared ownership interests does not equate their corporate forms and does not make Silverbell a named insured under the Evanston Policy. The Evanston Policy provides that members of an insured partnership are insureds "only with respect to the conduct of your business." (Doc. 270-2 at 47). Silverbell did not conduct business for Scott Homes. The Court rejects Lexington's argument.

1

#### e.      Subcontractors' Certificates of Insurance

2      Finally, Silverbell asks the Court to determine that Scott Homes complied with the

3   provision in the Evanston Policy requiring Scott Homes to obtain certificates of insurance

4   from all subcontractors. (Doc. 273 at 8). Because the Evanston Policy provides coverage

5   for property damage arising out of the acts of a subcontractor only if Scott Homes

6   obtained certificates of insurance from the subcontractor, failure to comply with this

7   provision excludes from coverage the loss caused by that subcontractor.[11] (Doc. 270-2 at

8   19). Although Silverbell now offers the declaration of Steven Robson that Scott Homes

9   obtained all relevant certificates, Lexington aptly points out that Robson does not

10   establish an adequate foundation for his testimony.

11      Robson declares that "[b]ased upon information and my belief," Scott Homes'

12   requirements that each subcontractor provide a certificate of insurance "were followed by

13   the subcontractors that worked on [the Apartments]." (Doc. 277 at 2). But Robson's

14   "information" and "belief" does not establish Robson's personal knowledge that Scott

15   Homes obtained the certificates. Indeed, Robson also testifies in the same declaration that

16   he played "no meaningful role" in the construction of the Apartments, he had no role in

17   the hiring of subcontractors, and was an "absentee owner." (*Id.* at 3). Thus, Silverbell has

18   not established a foundation for admitting Robson's testimony concerning the obtaining

19   of certificates. *See* Fed. R. Evid. 602. A grant of summary judgment cannot be based

20   upon inadmissible evidence. *Quanta Indem. Co. v. Amberwood Dev. Inc.*, 2014 WL

21   1246144, at *2 (D. Ariz. Mar. 26, 2014). At trial, if Silverbell seeks to use a particular

22   subcontractor's faulty work causing property damage to prove that Scott Homes was

23   liable for more than $1 million in covered property damage, Silverbell must introduce

24   testimony from witnesses with personal knowledge of Scott Homes' operations to prove

25   _____

26      [11] As the Court noted in its ruling on Lexington's first motion for summary
judgment, Silverbell has to date not produced the certificate of insurance for Gypsum
27   Floor Masters, Inc. from July 1, 2002 to July 1, 2003. (Doc. 159 at 16 n.10). Of course,
producing a copy of the certificate is not the same as Scott Homes having obtained
28   certificates at the time of the subcontractors performing their work, the latter being the
requirements of the Evanston Policy.

that Scott Homes obtained that subcontractor's certificate of insurance. Silverbell also must prove, as the Evanston Policy requires, that these certificates of insurance provided evidence of the four requirements enumerated in the Evanston Policy (notably, limits of liability and coverage). *See* (Doc. 270-2 at 19).

### 2.      Lexington's Duty to Defend

Silverbell asks the Court to determine that four facts are undisputed: (1) the exhaustion of the Evanston Policy triggered Lexington's duty to defend Scott Homes in the Underlying Lawsuit; (2) Lexington failed to defend Scott Homes after being provided with notice and opportunity to do so; (3) on October 5, 2012, Lexington declined to defend Scott Homes on the basis that not all underlying insurance to the Lexington Excess Policy had exhausted and Evanston's payment of its policy limits may not have been payment for covered claims; and (4) Lexington's failure to defend Scott Homes after the exhaustion of the Evanston Policy was a material breach of the Lexington Excess Policy. (Doc. 273 at 3-4, 9-10, 14).

Silverbell is entitled to summary adjudication on all four facts. For the reasons the Court stated in its discussion of Lexington's present motion for summary judgment, the Court concludes that the execution of the Settlement Agreement and Evanston's payment of its policy limits triggered Lexington's duty to defend Scott Homes in the Underlying Lawsuit. Lexington's duty to defend arose no later than September 19, 2012. Lexington had the notice and opportunity to defend Scott Homes but failed to do so. Lexington's October 5, 2012 letter clearly refused to defend Scott Homes. That letter stated that Lexington believed not all insurance underlying to the Lexington Excess Policy had exhausted and that Lexington believed Evanston's payment of its policy limits may not have been payment for covered claims. Because Lexington had the duty to defend Scott Homes and refused to do so, this refusal was a material breach of the Lexington Excess Policy. *See* (Doc. 270-1 at 4).

### 3.      Terms of the Lexington Excess Policy

Silverbell also asks that the Court determine that three other facts concerning the

Lexington Excess Policy are undisputed: (1) The Lexington Excess Policy applies to "property damage" if the "property damage" is caused by an "occurrence" that takes place in the "coverage territory" and the "property damage" occurs during the policy period; (2) the Lexington Excess Policy defines "property damage" as physical injury to tangible property and loss of use of that property; and (3) the Lexington Excess Policy provides coverage "for 'property damage' to 'your work' arising out of it or any part of it and included in the 'products completed operations hazard' when the damaged work or the work out of which the damage arises was performed on Scott Homes' behalf by subcontractors." (*Id.* at 4).

Lexington acknowledges these facts concerning the Lexington Excess Policy's language are undisputed, although it quotes the exact policy language rather than agreeing with Silverbell's paraphrasing of it. (Doc. 291 at 2 n.1). Because Silverbell's "facts" consist solely of the Lexington Excess Policy and Evanston Policy's plain language, and Lexington does not dispute this language, the Court need not (and declines to) make any determinations at this time. The Evanston Policy and the Lexington Excess Policy speak for themselves.

### 4.      The Stipulated Judgment

Silverbell moves for partial summary judgment on Count XVI of Lexington's First Amended Complaint. (Doc. 273 at 13). Specifically, Silverbell requests summary judgment on the issue of the reasonableness of the Stipulated Judgment; Silverbell asks the Court to determine as a matter of law that the Stipulated Judgment is for "property damage and attorneys' fees for claims related to and/or damages caused by the work of [Scott Homes'] subcontractors" and it is "a legal obligation of Scott Homes to pay to [Silverbell] the sum of $6 million for property damage and attorneys' fees." (Doc. 273 at 13).

In response, Lexington contends the Stipulated Judgment does not bind Lexington because Lexington was never a party to the Settlement Agreement. The Court has already addressed this argument in its analysis of Lexington's present motion for summary

judgment, and for the reasons stated therein, concludes that Lexington is bound as to the existence and extent of Scott Homes' liability. *See Quihuis*, 334 P.3d at 729-30 ¶ 38. Similarly, Lexington is incorrect in contending it may contest the reasonableness of the Stipulated Judgment. *See id.* at 730 ¶ 39. Moreover, Lexington is incorrect that the Stipulated Judgment is not a legal obligation of Scott Homes. *See* (Doc. 291 at 14 n.14). As the Court explained in analyzing Lexington's present motion for summary judgment, Silverbell's covenant to not execute against Scott Homes did not release Scott Homes from its obligations.

Finally, Lexington argues that Silverbell has not established that the Stipulated Judgment is exclusively for claims and attorneys' fees caused by Scott Homes' subcontractors. (*Id.* at 14-15). For the reasons already stated, the Stipulated Judgment is binding upon Lexington as to the existence of Scott Homes' liability to Silverbell; to the extent Lexington is arguing the claims addressed in the Stipulated Judgment are not covered under the Lexington Excess Policy, this argument is appropriately made at trial when Lexington may litigate coverage.

For these reasons, Silverbell is entitled to partial summary judgment on Count XVI of Lexington's First Amended Complaint with respect to the reasonableness of the Stipulated Judgment.

### 5.    Fraud or Collusion

Silverbell separately moves for partial summary judgment on Count XVI of Lexington's First Amended Complaint with respect to whether the Stipulated Judgment is the product of fraud or collusion. (Doc. 273 at 13). Silverbell offers, among other evidence, the declaration of Steven Robson, president and sole shareholder of Scott Homes. (Doc. 277). Robson testifies that he played no role in the hiring of Scott Homes' subcontractors and that he played no role in the negotiation of the Settlement Agreement other than to execute the Settlement Agreement. (*Id.* at 3). Robson also testifies he had no role in negotiating the Stipulated Judgment. (*Id.*)

Lexington vigorously asserts that the Settlement Agreement and Stipulated

Judgment are products of fraud and collusion between Silverbell and Scott Homes. (Doc. 291 at 14-16). However, Lexington's sole evidence on the issue of fraud and collusion is evidence of shared ownership interests between the two entities.

Steven Robson has been the sole owner and operator of Scott Homes since 2001. (Doc. 293-2 at 17). Prior to 2009, Robson also had a 50% ownership interest in Silverbell, consisting of a 49% ownership interest as a limited partner in Silverbell and a 1% ownership interest through Timberline Village Corporation, Silverbell's general partner. (*Id.* at 49). Robson is the sole owner of Timberline Village Corporation. (*Id.* at 22-23). Prior to 2009, three other family members related to Robson held the remaining 50% ownership interest in Silverbell. (*Id.* at 24, 49).

In 2009, investors purchased an ownership interest in Silverbell; Robson's ownership interest declined to approximately 39%, and Summers Windsor Court LLC then owned approximately 19%. (*Id.* at 64, 95). Silver Bell Investors, LLC owned approximately 2%, and the owners of Silver Bell Investors, LLC are Peter Hollingshead and Thomas Cologna. (*Id.* at 95).

Finally, as of 2013, Silverbell's ownership consisted of Silver Bell Investors, LLC at approximately 11%; Robson at approximately 44% (including 1% for Timberline Village Corporation); and Robson's family members at approximately 44%. (*Id.* at 85).

As an owner of both Silverbell and Scott Homes, Robson had an attorney-client relationship with counsel for both entities during the Underlying Lawsuit. (Doc. 293-3 at 13-14). Robson also possessed substantive information relating to the defense of Scott Homes and relating to the prosecution of Silverbell's claims. (*Id.* at 17). When Silverbell held conference calls with its counsel, Robson would usually be on those calls. (*Id.* at 110).

Lexington contends that the Settlement Agreement was negotiated in "back office dealings" while Lexington was kept "completely in the dark." (Doc. 291 at 16). In the section of this Order discussing the Settlement Agreement's status as a valid *Damron* agreement, the Court has detailed the extensive notice and opportunity provided to

Lexington, and the Court will not repeat those details here. Aside from this mischaracterization of the evidence, Lexington offers *only* the shared ownership interests of Silverbell and Scott Homes as a basis for the Court to find a genuine issue of material fact as to whether the Settlement Agreement and Stipulated Judgment are products of fraud or collusion.

To survive summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Lexington asks the Court to conclude that the mere fact of shared ownership between Silverbell and Scott Homes—without more—is an adequate basis for a jury's finding of fraud or collusion. But there is nothing inherently fraudulent in a real estate developer having an equity stake in both a real estate project and a construction business, and for those two entities to contract with each other. Lexington does not assert, nor could it credibly do so, that Silverbell and Scott Homes fraudulently entered into other contracts, such as the original construction contract for Scott Homes to build the Apartments. Furthermore, it is neither surprising nor material to this case that Robson had information relating to both Silverbell and Scott Homes and was on conference calls; one expects a person having an ownership interest in a company to keep informed as to events affecting the company's operations.

Because Lexington's *sole* evidence of fraud or collusion is the shared ownership of Silverbell and Scott Homes, if the Court declined to grant summary judgment on this issue in favor of Silverbell, the Court would necessarily have to conclude that shared ownership, standing alone, is a sufficient basis to support a reasonable jury's finding of fraud or collusion in the execution of a *Damron* agreement. Such a conclusion would bar any entities having mutual owners from *ever* entering into a *Damron* agreement. *Damron* and its progeny hold precisely the opposite; *Damron* agreements are not per se fraudulent or collusive. Lexington's position would turn Arizona law on its head.

If Lexington had shown actual evidence of fraud or collusion, it would defeat Silverbell's motion for summary judgment. Because Lexington offers as evidence only

the shared ownership interests of Silverbell and Scott Homes as well as Robson's participation in the management of the companies, Lexington fails to show the existence of a genuine issue of material fact as to whether the Settlement Agreement and Stipulated Judgment are fraudulent or collusive. Accordingly, Silverbell is entitled to partial summary judgment on this issue.

### 6.    Bad Faith

Silverbell moves for summary judgment on its counterclaim against Lexington for Lexington's breach of the covenant of good faith and fair dealing. (Doc. 273 at 16-17). The Court has already stated the applicable legal standard for an insurance bad faith claim in its analysis, *supra*, of Lexington's present motion for summary judgment. There, the Court concludes that a genuine issue of material fact exists as to whether Lexington's claim handling constitutes bad faith. Silverbell now asks the Court to go a step further and declare that it has proved bad faith as a matter of law. (Doc. 273 at 16).

Silverbell relies heavily upon the Court's prior determination that Lexington's interpretation of the Lexington Excess Policy in this litigation is unreasonable. *See* (*id.* at 17). For the reasons stated earlier in this Order, Silverbell has not shown that Lexington's filings in this lawsuit are evidence of the unreasonableness of Lexington's positions outside of this lawsuit.[12] Thus, the Court declines to grant summary judgment in favor of Silverbell on its bad faith counterclaim.

### IV.   Motion for Sanctions and Motion for Leave to Replace the Motion for Sanctions

On August 13, 2014, Lexington filed a motion for sanctions titled "Plaintiff's Motion for Violation of Rule 11 and for Sanctions" (Doc. 298). Lexington sought sanctions against Silverbell and Scott Homes for alleged factual misrepresentations to the Court concerning a requested continuance in the Underlying Lawsuit. (Doc. 298 at 2-3). Twelve days later, Lexington filed a notice of errata and a motion for leave to file a new

---

[12] The Court is not commenting upon the reasonableness or unreasonableness of Lexington's positions taken outside of the present lawsuit.

Rule 11 motion, captioned as "Plaintiff's Notice of Errata and Motion for Leave to Replace Incorrectly-Filed Motion for Violation of Rule 11." In this latter filing, Lexington asserts that it inadvertently filed an outdated version of its Rule 11 motion and it intended to file a version containing additional allegations of misrepresentations by Silverbell and Scott Homes. (Doc. 303 at 5).

Because Lexington's filed Rule 11 motion is fully briefed, the Court will address its merits before deciding whether to permit Lexington to file the corrected version.

### A.    Rule 11 Legal Standard

The "central purpose of Rule 11 is to deter baseless filings in district court" by requiring attorneys to certify that "they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and 'not interposed for any improper purpose.'" *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Rule 11 provides that by presenting a motion to the Court, the person signing the motion "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b).

Rule 11's factual inquiry requirement is satisfied if there is "*any* factual basis for [an] allegation." *Brubaker v. City of Richmond*, 943 F.2d 1363, 1377 (4th Cir. 1991). Even weak circumstantial evidence insufficient to withstand summary judgment is sufficient to establish a factual basis sufficient to withstand Rule 11. *Cal. Architectual Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987); *see also Lucas v. Duncan*, 574 F.3d 772, 777 (D.C. Cir. 2009).

### B.    Analysis

Lexington's basis for sanctions is the following paragraph from Defendants and Counterclaimant's Response to Plaintiff's Motion for Summary Judgment (Doc. 287):

> Lexington represented to this Court that once it had an executed copy of the Settlement Agreement there was no

need to defend or indemnify Scott Homes. Lexington makes this representation with specific knowledge of the fact that upon receipt of the Settlement Agreement and proof of Evanston's exhaustion, *it sought a continuation of the September 25, 2012 trial date to consider its defense obligations to Scott Homes in the pending defect trial.* (SOF ¶ 52);

(Doc. 287 at 12:9-14) (emphasis added).[13] Lexington contends this paragraph misrepresents that Lexington requested a continuance of the trial date in the Underlying Lawsuit. (Doc. 298 at 2-3). As evidence of this misrepresentation, Lexington cites the transcript of a September 19, 2012 hearing before the court in the Underlying Lawsuit in which Mr. Meisenhelder, current counsel for Silverbell, asked for a continuance of the trial date: "So at this point in time we would request a continuance of the trial date." (Doc. 297-3 at 43:4-5). Lexington also offers the declaration of Ms. Hedberg, Lexington's counsel present at the hearing, who declares that she did not request a continuance from the Court and never asked Silverbell, Scott Homes, or their counsel for a continuance of the trial date in the Underlying Lawsuit. (Doc. 300 at 2).

Lexington misinterprets Silverbell's statement because Silverbell never stated that Lexington's request for a continuance occurred at the hearing or even before the court. As Silverbell correctly points out, most litigation occurs outside the courtroom. Silverbell's statement clearly implies that Lexington requested a continuance, but clearly does *not* imply that Lexington requested a continuance *before the court* in the Underlying Lawsuit. Silverbell suggests that Lexington made its request through either the mediator or Scott Homes' insurance defense counsel, Mr. Righi. (Doc. 301 at 7). On this point alone, Lexington cannot meet its burden of proving Silverbell's statement had no evidentiary support.

Moreover, although Ms. Hedberg now authors a declaration in support of Lexington's Rule 11 motion stating that she never asked Silverbell, Scott Homes, or their

---

[13] This paragraph is based upon paragraph 52 of Silverbell's supplemental statement of facts, which contains the same language that "Lexington sought a continuation." *See* (Doc. 288 at 41).

counsel for a continuance, three pieces of evidence support Silverbell's statement. Jodi Mintz, Lexington's assistant vice-president responsible for supervising the claims handling of the Silverbell and Scott Homes matter, testified at her deposition that Ms. Hedberg had requested Mr. Righi ask the court for a continuance:

> Q.    On September 19th, there was a superior court hearing in Arizona, and Kelly Hedberg on behalf of the Renaud firm was present in the courtroom on Lexington's behalf.
>
> Are you aware of that?
>
> A.    I am aware that Kelly was present at a hearing in September of 2012.
>
> Q.    And she had communicated at Lexington's request that Mr. Righi ask the court to continue the time for the trial and the time for Lexington to consider whether or not they were going to defend the case.
>
> Do you know that to be true?
>
> A.    I do know that is true based on an e-mail that I read contained in the claim file.

(Doc. 302-3 at 6-7).

Second, Sharon Wills, Lexington's claims handler for the Silverbell and Scott Homes matter, testified at her deposition:

> Q.    Okay. And Lexington had had Kelly Hedberg of Mr. Mesaro's office go to court and, through Mr. Righi, inform the court that Lexington was still considering what it wanted to do and that Lexington wanted more time to respond?
>
> A.    I think so, yes.

(Doc. 302-4 at 3).

Third, Jodi Mintz testified in a later deposition in her capacity as Lexington's Rule 30(b)(6) deponent:

> Q.    BY MR. ELLIOTT: Lexington was aware, because they sent her, Kelly Hedberg to the Arizona Superior Court on September 19th, 2012, to request through Mr. Righi that Lexington be given additional time to respond to the question of whether or not they were going to defend Scott, true?
>
> MS. RIBEIRO:    Object to form.

- 45 -

1
2
3

> THE WITNESS:   Lexington is aware that Kelly attended a hearing and that Kelly requested additional time for Lexington to defend Scott unconditionally without a reservation of rights.

4   (Doc. 302-5 at 4).

5          These three deposition transcripts are clear evidence supporting Silverbell's

6   factual contentions. Nevertheless, Lexington claims the questioning in each deposition

7   was improper and falsely suggested that Lexington had requested a continuance, and thus

8   this deposition testimony is unreliable. (Doc. 305 at 4). Essentially, Lexington now seeks

9   to impeach its own employees' testimony. But the transcripts unequivocally show that the

10  deponents were not misled; each affirmatively testified that Lexington asked for a

11  continuance.

12         It is of no consequence that Ms. Hedberg now testifies that Lexington never asked

13  for a continuance. Rule 11 does not require factual contentions to be ultimately proved to

14  be true. Rather, Rule 11 requires only *some* evidentiary support for a factual contention.

15  Here, ample evidentiary support existed for Silverbell's statement that Lexington

16  requested a continuance. Accordingly, Silverbell did not violate Rule 11.[14]

17         **C.    Motion for Leave to Replace the Motion for Sanctions**

18         Lexington asks the Court for leave to replace its Rule 11 motion with a revised

19  version. (Doc. 303). The Federal Rules of Civil Procedure do not limit the number of

20  Rule 11 motions that a party may file. Rather, Rule 11 applies to all motions, and thus a

21  party who files a Rule 11 motion is subject to Rule 11's certification requirements for

22  that motion. *See* Fed. R. Civ. P. 11 Advisory Committee Notes to the 1993 Amendments

23  (". . . [T]he filing of a motion for sanctions is itself subject to the requirement of the rule

24  and can lead to sanctions.").

25         The Court sees no grounds at present for restricting Lexington's filing of Rule 11

26  motions. The Court will deny Lexington's motion but Lexington may choose to file a

27
28         [14] Because the Court concludes Lexington's motion fails on the merits, it need not address Silverbell's argument that Lexington violated Rule 11(c)(2) by failing to properly serve the motion.

- 46 -

new Rule 11 motion on the additional issues that it intended to address in its original motion.

**D.     Attorneys' Fees**

Silverbell and Scott Homes ask the Court to sanction Lexington for filing a groundless Rule 11 motion. (Doc. 301 at 7-8). Rule 11(c) provides that "[i]f warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion." Fed. R. Civ. P. 11(c)(2); *see also* Fed. R. Civ. P. 11 Advisory Committee Notes to the 1993 Amendments (". . . [T]he court may award to the person who prevails on a motion under Rule 11—whether the movant or the target of the motion—reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion."). This provision is not "designed as a fee-shifting provision or to compensate the opposing party," but rather to "deter sanctionable conduct." *Truesdell v. S. Cal. Permanente Med. Grp.*, 209 F.R.D. 169, 175 (C.D. Cal. 2002). In determining whether and to what extent to impose sanctions, including an award of attorneys' fees, a court must "embrace the overriding purpose of deterrence and mold its sanctions in each case so as to best implement that policy." *In re Yagman*, 796 F.2d 1165, 1184 (9th Cir. 1986).

An award of reasonable expenses to Defendants is appropriate. A motion for Rule 11 sanctions is not to be taken lightly. In filing the motion, Lexington certified that it was not being filed for an improper purpose, such as to harass or needlessly increase the cost of litigation. *See* Fed. R. Civ. P. 11(b)(1). Lexington also certified that its factual contentions, namely its allegations that Silverbell misrepresented the facts, had evidentiary support. *See* Fed. R. Civ. P. 11(b)(2). But Lexington's factual contentions are facially deficient because Silverbell's factual representations are not what Lexington purports them to be. Nor is Lexington's misinterpretation inadvertent. In Lexington's reply in support of its Rule 11 motion, after Silverbell cited the pieces of evidence supporting its statement, Lexington not only reiterated its misrepresentation claim but accused Silverbell's counsel of making additional misrepresentations in Silverbell's

response to Lexington's motion. (Doc. 305 at 2).

Moreover, the Court is convinced that awarding Defendants its reasonable expenses incurred in connection with Lexington's motion is necessary to deter Lexington from future sanctionable conduct. Lexington's counsel has a history of failing to comply with the rules governing practice in the District of Arizona. For example, Lexington misquoted the Settlement Agreement in a manner tending to cause the reader to draw an inference directly contrary to the meaning of the quoted language. The Court noted that at least one other court found substantially equivalent conduct to be sanctionable under Rule 11 and admonished Lexington. *See* (Doc. 159 at 13 n.7). Additionally, Lexington's second motion for summary judgment, Lexington's response to Silverbell's motion to summary judgment, and Lexington's reply in support of its motion for summary judgment violate Local Rule 7.2(e), even after the Court excludes the caption page and the certificate of service from the page counts. Finally, Lexington's Rule 11 motion is not only frivolous on its merits but also procedurally: Lexington could have used its reply to adequately address the issue.

For all of these reasons, the Court will award Defendants their reasonable expenses, including attorneys' fees, incurred in connection with Lexington's Rule 11 motion. Any award will be against Lexington's counsel. Furthermore, the Court notes that the attorneys who have signed the aforementioned filings are admitted *pro hac vice* to the District of Arizona. "[O]ut-of-district counsel's appearance *pro hac vice* is not a right but a privilege, especially in a civil case." *Kaufman v. Jesser*, 2012 WL 4478807, at *2 (D. Ariz. Sept. 28, 2012). "Attorneys admitted to practice pro hac vice must comply with the Rules of Practice of the United States District Court for the District of Arizona." LRCiv 83.1(b)(2). If Lexington's counsel persists in its present course of conduct, the Court may have cause in the future to consider revoking *pro hac vice* status. Counsel is warned accordingly.

## V.    Summary

### 1.    Issues for Trial

In summary, the following issues remain for trial. First, there is the issue of coverage. Silverbell must prove at trial that Scott Homes suffered more than $1 million in "property damage" as that term is defined in the Evanston Policy (and incorporated in the Lexington Excess Policy). To the extent that Silverbell seeks to meet this burden by showing property damage caused by a subcontractor of Scott Homes, Silverbell must prove that Scott Homes obtained that particular subcontractor's certificate of insurance and the certificate provided evidence of the four requirements enumerated in the Evanston Policy.

If Silverbell proves more than $1 million in covered property damage, then it has proved coverage under the Lexington Excess Policy. Although a finding of coverage will render Lexington liable to Silverbell for the outstanding amount of the Stipulated Judgment ($5 million), Silverbell must also show that it did not receive payments from sources other than Evanston for the claims upon which the Stipulated Judgment is based; to the extent any such other payments exist, they will reduce Lexington's liability under the Stipulated Judgment accordingly.

Second, there is the issue of bad faith. Silverbell must prove at trial that in the investigation, evaluation, and processing of Scott Homes' claim, Lexington acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable. Silverbell must also prove that Lexington's bad faith caused damages.

### 2.    Counts

With respect to Lexington's First Amended Complaint: Silverbell is entitled to judgment on Count I. Counts II, III, IV, V, VI, VII, VIII, IX, X, and XI are coverage issues to be litigated at trial. Silverbell is entitled to judgment on Count XII for the reasons discussed in this Order about the "cross-suits" exclusion to the Lexington Excess Policy. Silverbell is entitled to judgment on Counts XIII, XIV, and XV because the Court has determined that Scott Homes did not breach its cooperation obligation to Lexington.

1   Silverbell is entitled to judgment on Count XVI because there is no genuine issue of

2   material fact.

3        With respect to Silverbell's counterclaims: Count I (duty to defend and coverage)

4   remains an issue for trial because although Silverbell has established Lexington's duty to

5   defend as a matter of law, the remaining portion of Count I concerns coverage and

6   coverage is an issue for trial. Count II (bad faith) is an issue for trial, but Silverbell is not

7   entitled to punitive damages.

8   **VI.      Conclusion**

9        For the foregoing reasons,

10  /

11  /

12  /

13  /

14  /

15  /

16  /

17  /

18  /

19  /

20  /

21  /

22  /

23  /

24  /

25  /

26  /

27  /

28  /

**IT IS ORDERED** that Plaintiff's Motion to Reopen Discovery (Doc. 310) is denied.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 281) is granted in part and denied in part.

**IT IS FURTHER ORDERED** that Defendants/Counterclaimants Silverbell 290 Limited Partnership and Scott Homes Multifamily, Inc.'s Motion for Summary Judgment/Summary Adjudication (Doc. 273) is granted in part and denied in part.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Violation of Rule 11 and for Sanctions (Doc. 298) is denied.

**IT IS FURTHER ORDERED** that Plaintiff's Notice of Errata and Motion for Leave to Replace Incorrectly-Filed Motion for Violation of Rule 11 (Doc. 303) is denied.

**IT IS FURTHER ORDERED** that, within fourteen days from the date of this Order, Defendants may move for an award of reasonable expenses, including attorneys' fees, incurred in connection with Plaintiff's Motion for Violation of Rule 11 and for Sanctions (Doc. 298) and Plaintiff's Notice of Errata and Motion for Leave to Replace Incorrectly-Filed Motion for Violation of Rule 11 (Doc. 303). Any motion must comply with Local Rule of Civil Procedure 54.2.

Dated this 23rd day of February, 2015.

James A. Teilborg
Senior United States District Judge